Michelle C. Yau (admitted *pro hac vice*)
Mary J. Bortscheller (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel. (202) 408-4600
Fax (202) 408-4699
myau@cohenmilstein.com
mbortscheller@cohenmilstein.com

Daniel Feinberg (SBN No. 135983)
Nina Wasow (SBN No. 242047)
FEINBERG, JACKSON,
WORTHMAN & WASOW LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
nina@feinbergjackson.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMANDO ZAVALA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREATBANC TRUST COMPANY, KEVIN KRUSE, THE KRUSE-WESTERN, INC. BOARD OF DIRECTORS, THE ADMINISTRATION COMMITTEE, and JOHN AND JANE DOES 1-30,<br><br>Defendants. | Case No. 1:19-cv-00239-DAD-SKO<br><br>**AMENDED CLASS ACTION COMPLAINT** |

## I.   INTRODUCTION

1.      This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502 (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), by Plaintiff, on behalf of himself and other participants and beneficiaries in the Western Milling ("Western Milling")  Employee Stock Ownership Plan ("ESOP" or "Plan") arising out of the sale of Kruse-Western, Inc. ("Kruse-Western" or "Company") stock to the ESOP for an inflated value and the resulting loss of tens of millions of dollars to the ESOP.

2.      The Western Milling ESOP is a pension plan under ERISA that is designed to be and is primarily invested in the stock of the Company.

3.      The claims in this action stem from the creation of the ESOP in November 2015.  On November 4, 2015, Kevin Kruse and John and Jane Does 21-30 (the "Selling Shareholders") sold 100% of outstanding Kruse-Western stock to the newly created Western Milling ESOP for $244,130,400 (the "2015 ESOP Transaction").

4.      In contravention of their fiduciary duties and ERISA's prohibited transaction rules, the ESOP trustee, GreatBanc Trust Company ("GreatBanc"); Kevin Kruse and the other members of the Board of Directors; and the Selling Shareholders, orchestrated the sale of the Company to the ESOP for greater than fair market value.

5.      Specifically, the Selling Shareholders negotiated an inflated sale price with GreatBanc, which unjustly enriched the Selling Shareholders, and caused harm to the ESOP participants, who are current and former employees of the Company. As a result of ERISA violations by the fiduciaries entrusted with their Plan, Plaintiff and the Class have not received all of the hard-earned retirement benefits or the loyal and prudent management of the ESOP to which they are entitled.

6.      As alleged below, the sale price for the 2015 ESOP Transaction failed to adequately account for liabilities associated with the recurrent contamination of animal feed produced by Western Milling.

7.      Just two months after the 2015 ESOP Transaction, the Kruse-Western stock purchased by the Company's employees was worth almost 90% less than they had paid for it.

8.      ERISA Sections 409(a), 502(a)(2) & (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) & (a)(3), authorize participants such as Plaintiff to sue in a representative capacity for losses suffered by the ESOP.  Pursuant to that authority, Plaintiff brings this action on behalf of all participants in the Western Milling ESOP and their beneficiaries for violations of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104, 1106.

9.      **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

10.     **Personal Jurisdiction**.  This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, and because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.

11.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), for at least the following reasons:

(a)      Defendants may be found in this District, as they transact business in, and/or have significant contacts with this District;

(b)      Some Defendants reside in this District; and/or

(c)      Some of the alleged breaches took place in this District.

## II.  PARTIES

**Plaintiff**

12.     Plaintiff Armando Zavala is a former employee of the Company and a current participant in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Plaintiff Zavala worked at Western Milling between 2015 and May of 2018, as a trailer mechanic and a truck loader. At the time he left the Company, Plaintiff Zavala was vested in the ESOP.  He currently resides in Porterville, California.

**Defendants**

13.     **Defendant GreatBanc Trust Company** is the Trustee of the Western Milling ESOP within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). GreatBanc holds, manages and controls the ESOP's assets. GreatBanc is a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because it exercises discretionary authority or discretionary

control respecting management of the ESOP, exercises authority and control respecting management or disposition of the ESOP's assets, and/or have discretionary authority or discretionary responsibility in the administration of the ESOP. On information and belief, Defendant GreatBanc authorized the ESOP's purchase of Kruse-Western stock from the Selling Shareholders.

14.     **Defendant Kevin Kruse** is and at all relevant times was the President of Kruse-Western. On information and belief, Defendant Kruse is also a member of the Kruse-Western Board of Directors. According to the ESOP Plan Document, the Board of Directors, acting for the Company, appoints the Trustee of the ESOP and the Administration Committee of the ESOP.  As a result of his membership on the Board of Directors, Mr. Kruse is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

15.     **Defendant Kruse-Western Board of Directors**, according to the ESOP Plan Document, appoints the Trustee of the ESOP and the Administration Committee of the ESOP, acting for the Company. The Board of Directors is a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

16.     **Defendants John and Jane Does 1-10** are the other individual members of the Board of Directors of Kruse-Western from 2014 until the present. Together with Defendant Kruse and the Board of Directors itself, John and Jane Does 1-10 are referred to collectively herein as the **"Board Defendants."** The names of the Board members other than Kevin Kruse are unknown to Plaintiff. Once their identities are ascertained, Plaintiff will substitute their names.

17.     On August 5, 2019, Plaintiff's counsel requested that Defendants' counsel provide the names of the members of the Board of Directors in advance of Plaintiff's amended complaint deadline so that Plaintiff could name these individuals as defendants in the amended complaint, but on August 7, 2019, Defendants' counsel refused to provide these names. Each member of the Board of Directors is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

18.     The Board Defendants appointed GreatBanc to be the Trustee of the ESOP in 2015 and appointed the members of the Administration Committee of the ESOP from 2015 to the present. The Board Defendants had an ongoing obligation to monitor GreatBanc and the Administration Committee to ensure they were acting prudently, loyally and in conformance with ERISA's fiduciary requirements and to ensure that the ESOP did not engage in a prohibited transaction when purchasing the Company stock.

19.     Under California Corporations Code § 5210, the activities and affairs of the Company must be managed and all corporate powers must be exercised by or under the ultimate direction of the Board Defendants.

20.     As part of their corporate oversight responsibilities, the Board Defendants were involved in the preparation, review and/or approval of the Company's financial statements and projections.

21.     **Defendant Administration Committee** is a designated Plan Administrator of the ESOP within the meaning of ERISA § 3(16)(A), § 1002(16)(A), and a named fiduciary of the ESOP within the meaning of ERISA § 402, 29 U.S.C. § 1102. The Administration Committee is and was a fiduciary of the ESOP under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of its position as Plan Administrator and because it exercised discretionary authority or discretionary control respecting the management of the ESOP, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP.

22.     **Defendants John and Jane Does 11-20** are the persons serving on the Administration Committee of the ESOP from before the 2015 ESOP Transaction to the present. The identities of the members of the Administration Committee are currently are unknown to Plaintiff. Once their identities are ascertained, Plaintiff will substitute their names.

23.     On August 5, 2019, Plaintiff's counsel requested that Defendants' counsel provide the names of the Administration Committee members in advance of Plaintiff's amended complaint deadline so that Plaintiff could name these individuals as defendants in the amended complaint, but on August 7, 2019, Defendants' counsel refused to provide these names. The Administration

Committee, along with the individual members of the Committee, are collectively referred to herein as the **"Administrator."**

24.     **John and Jane Does 21-30** are the other selling shareholders who sold their stock in the Company to the ESOP in the 2015 ESOP Transaction, the identities of whom are unknown to Plaintiff at this time. Together with Mr. Kruse, John and Jane Does 21-30 are referred to collectively herein as the **"Selling Shareholders."** The names of the Selling Shareholders other than Mr. Kruse are unknown to Plaintiff.

25.     On August 5, 2019, Plaintiff's counsel requested that Defendants' counsel provide the names of the Selling Shareholders in advance of Plaintiff's amended complaint deadline to allow Plaintiff to name these individuals as defendants in the amended complaint. On August 7, 2019, Defendants' counsel refused to provide these names. Once their identities are ascertained, Plaintiff will substitute their names. Each of the Selling Shareholders is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

### III.  FACTUAL ALLEGATIONS

<u>Western Milling's History of Monensin Poisoning Issues</u>

26.     Kruse-Western, Inc. operates various companies in California, including Western Milling, LLC, OHK Transport LLC, OHK Logistics, LLC, and Winema Elevators, LLC.

27.     Western Milling, LLC manufactures a variety of animal feeds.

28.     According to its website, Western Milling aspires "to be the leading and most diverse agriculturally based, nutrient solutions business in the Western United States."

29.     At all relevant times, Western Milling manufactured Western Blend Horse Feed and other animal feeds. Manufacturing animal feed for different species requires a high level of care to avoid cross-contamination. For example, monensin is an ionophore antibiotic that is added to some cattle and poultry feeds. Monensin, however, is highly poisonous to horses.

30.     Between December 2009 and July 2010, the United States Food and Drug Administration found "impermissibly high" samples of monensin in feed samples produced by the Company. Western Milling recalled horse feed in 2011 and turkey feed in 2010 and 2011 due to monensin contamination.

31.     In September 2015, 21 horses died and 28 other horses were severely sickened at a horse ranch in Clovis, California, due to monensin poisoning caused by Western Blend Horse Feed. Many of the horses suffered a slow and painful death with symptoms including foaming at the mouth, muscle wasting, damage to the heart, colic, sweating, kidney failure, respiratory distress, and the inability to stand. Some of the horses had to be euthanized.

32.     In September 2015, Western Milling issued a recall for Western Blend Horse Feed due to possible monensin contamination.

33.     In 2016, the same facility improperly mixed the same livestock drug into medicated cattle feed, which contributed to the deaths of several dairy calves.

34.     A lawsuit was filed against Western Milling in Fresno Superior Court in February 2016, and Western Milling agreed in 2018 to pay $2.4 million to plaintiffs to settle claims arising from the monensin poisoning caused by its horse feed.

35.     In addition to the lawsuit, the California Department of Food and Agriculture fined Western Milling $726,000 and revoked their commercial feed license "for repeated and multiple violations." Western Milling agreed to stop production of all horse feed at its Goshen, California plant by April 15, 2017.

36.     Western Milling also paid over $2 million to settle claims of the owners of cattle that consumed excessively high levels of monensin in August 2014. More than 850 cattle died as a result of consuming feed produced by Western Milling.

37.     Western Milling continued to be plagued by monensin contamination problems after the 2015 ESOP Transaction. In September 2016, 87 calves died and 46 other calves were severely sickened after consuming Western Milling-produced feed that contained excessive levels of monensin.

38.     Upon information and belief, Kevin Kruse and other members of the Board of Directors were aware of contamination in the Company's feed products prior to the 2015 ESOP Transaction because they were privy to and had responsibilities over the Company's financials, which were affected by the contamination issues and associated liability.

39.     As a result of repeated monensin contamination incidents, Western Milling discontinued the manufacturing of horse and other specialty feeds at its Goshen mill, exited the horse feed business for about a year, and started contracting-out the manufacture of horse feed. Western Milling spent approximately $5.5 million to construct a new dedicated horse feed mill separate from its cattle feed mill.

40.     Upon information and belief, the feed mill industry recognized the need for dedicated production lines prior to 2015. Major producers of animal feed had "dedicated lines" in their mills, meaning that only horse feed was produced in that section of the mill, and other areas of the mill were used to produce other products, such as those that include monensin or other ionophores.

41.     In addition, Western Milling and its operating companies faced significant liability at the time of the 2015 ESOP Transaction due to wage and hour violations at its California facilities.

**The Western Milling ESOP**

42.     According to the Articles of Incorporation obtained from the California Secretary of State, Kruse-Western, Inc. was incorporated on September 11, 2015.

43.     Prior to January 1, 2016, Kruse-Western, Inc. was a "C corporation." On and after January 1, 2016, the Company converted to a "S corporation."

44.     The ESOP was created on November 4, 2015, to purchase 100% of the Company Stock from the Selling Shareholders.

45.     Prior to the 2015 ESOP Transaction, all or nearly all of the Company Stock was owned by the Selling Shareholders.

46.     The ESOP covers employees of Western Milling, LLC, OHK Transport LLC, OHK Logistics, LLC, and Winema Elevators, LLC.

47.     As required by 29 U.S.C. § 1102, the ESOP was established and is currently maintained pursuant to a written instrument, entitled the Western Milling Employee Stock Ownership Plan (the "Plan Document").

48.   The Plan Document states that the Board of Directors appointed and appoints members of the Administration Committee, which is the plan administrator for the ESOP and referred to as the "Administrator" in the Plan Document.

49.   According to the ESOP Plan Document, the Board of Directors, acting for the Company, appoints the Trustee of the ESOP.

50.   Section 13(b) of the Plan Document provides that, "Generally, the Trustee will vote shares of the Company Stock at the written direction of the Administrator."

51.   Section 4.3 of the Plan Document provides that "the Trustee shall invest the contributions made for such Accounting Period as directed by the Administrator, in accordance with the provisions of Section 6."

52.   Section 6.1, in turn, provides that the Administrator may direct the Trustee to invest the Employer Contributions in Company Stock.

53.   Section 7.5(b) provides that "Dividends credited to the Participants' ESOP Cash Accounts may, to the extent permitted by law, be applied to the repayment of the Acquisition Loan incurred in connection with the acquisition of such shares, or, as determined in the discretion of the Administrator, be used to purchase shares of Company Stock, or be paid to the Participants as described in Section 7.6(c)."

54.   Under Section 17.2(h), for the Trustee to act without direction from the Administrator, it must be authorized to do so by the Administrator in advance and the Trustee must provide written acceptance of such responsibility.

55.   The terms of the Plan Document establish that the Administrator had and has discretionary authority and control over the management of the ESOP at all times since the ESOP's creation in November of 2015.

56.   On information and belief, the members of the Administration Committee held management positions at Western Milling and/or Kruse-Western and thus knew of the Company's ongoing and persistent troubles with monensin contamination in feed products prior to and after September 2015.

57.     On November 4, 2015, GreatBanc, acting as Trustee of the ESOP, caused the ESOP to purchase 100% of Kruse-Western stock from the Selling Shareholders for $244,130,400. The ESOP borrowed the entire $244,130,400 to fund the purchase price paid to the Selling Shareholders.

58.     On information and belief, the ESOP borrowed the purchase price of $244,130,400 from the Company which, in turn, borrowed that amount from the Selling Shareholders.

59.     On information and belief, each of the Selling Shareholders deposited his/her share of the proceeds from the ESOP Transaction in his/her personal account and each such account continues to exist in the possession of the Selling Shareholders.

60.     On information and belief, the balance of each of the personal accounts into which the ESOP Transaction proceeds were deposited have remained above the amount of the total proceeds deposited therein.

61.     The Plan Document contemplates that some or all of the Selling Shareholders would invest the proceeds of the ESOP Transaction in "qualified replacement property" pursuant to Section 1042 of the Internal Revenue Code, in order to avoid capital gains tax on the sale of their Kruse-Western stock to the ESOP. Under I.R.C. § 1042, the gains on the sale of stock to the ESOP are taxed when the qualified replacement property is sold, and capital gains taxes can be entirely eliminated if the qualified replacement property is held by the Selling Shareholders until death. Thus, on information and belief, any Selling Shareholders who invested the proceeds in qualified replacement property continue to hold such property to avoid the adverse tax consequences.

62.     Each Selling Shareholder who sought deferral of capital gains pursuant to I.R.C. § 1042 was required to complete a signed Statement of Purchase that identified and declared the specific securities that represent the qualified replacement property that was purchased to avoid taxes on the receipt of proceeds from the ESOP Transaction. The Statement of Purchase for each Selling Shareholder who elected I.R.C. § 1042 deferral would be filed with his/her tax return.

63.     Less than two months after the ESOP purchased Kruse-Western stock from the Selling Shareholders, on December 31, 2015, the value of the Company was just $26,600,000, which meant that the Company stock lost almost 90% of its value in less than 2 months.

64.     One year later, the Company had further dropped in value and was worth just $24,800,000.

65.     By December 31, 2017, the Company had not materially regained the value paid by ESOP participants. The value of the Company was just $27,400,000 at the end of 2017, which represents a decline of 86% from the value at the time of the ESOP Transaction.

66.     The ESOP paid more than fair market value in the 2015 ESOP Transaction. On information and belief, the purchase price was based in part on a valuation report that was unreliable.

67.     As reported in the ESOP's governmental filings, since the inception of the ESOP in 2015, the valuation of Kruse-Western common stock is based on a combination of two primary valuation techniques:

- "Income (Discounted Cash Flows)" which determines the Company's value based on the discounted cash flows generated by the Company in the future using projections of the Company's future EBITDA (earnings before income tax, depreciation and amortization) and Net Income; and

- "Market (Guideline Public Company)" which determines the Company's value based on applying revenue and EBITDA multiples from comparable companies to the Company's projected revenue and EBITDA.

68.     Accordingly, if the financial projections (including EBITDA and Net Income) obtained from the Company's management are inflated, then the value of the Company is inflated.

69.     On information and belief, the 2015 ESOP Transaction price was based on unrealistic financial projections and did not adequately reflect future revenue and earnings given the recurring monensin contamination in Western Milling's animal feed.

70.     On information and belief, because Defendant Kevin Kruse and the Administrator held management positions at the Company, they knew of the monensin contamination in Western Milling's feed prior to the 2015 ESOP Transaction as well as the Company's potential liability for wage and hour violations, and they knew that the financial projections provided to the valuation firm for the ESOP Transaction did not adequately reflect

the Company's future revenues, cash flows and earnings because they did not adequately reflect these problems.

71.     Because California law requires the affairs and activities of the Company to be conducted by or at the direction and supervision of the Board, the Board Defendants also knew of the Company's problems with monensin contamination and its potential liability for wage and hour violations prior to the 2015 ESOP Transaction.

72.     Because the Board Defendants were involved in the preparation, review and approval of the Company's financial statements and projections as part of their corporate oversight, they also knew that the financial projections management provided to the valuation firm for the ESOP Transaction did not adequately reflect the Company's future revenues, cash flows and earnings because they did not adequately reflect the potential liability from monensin contamination and wage and hour violations.

73.     In addition, the Board Defendants selected the management and executives of the Company and were responsible for monitoring, evaluating and deciding their annual compensation and bonuses. As such, the Board Defendants knew that the Company's long-standing and persistent problems with monensin contamination, affecting the Company's future revenues, earnings and cash flow, would impact their compensation decisions for the Company's management and executives.

74.     Thus, Defendant Kevin Kruse, the Board Defendants, and the Administrator knew that ESOP overpaid for the Company stock in the ESOP Transaction.

75.     Kruse-Western took on excessive debt as part of the 2015 ESOP Transaction which has impaired the value of the ESOP's Company stock.

76.     Because the Board Defendants' responsibilities include strategic planning and capital management for the Company, they knew that the ESOP Transaction required the Company to take on excessive debt.

77.     On information and belief, because Defendant Kevin Kruse and the Administrator held management positions at the Company, they also knew that that the ESOP Transaction required the Company to take on excessive debt.

78.     Thus, Defendant Kevin Kruse, the Administrator and the Board Defendants knew that the ESOP Transaction was imprudent in that it required the Company to take on excessive debt, which left the Company over-leveraged and in a precarious financial position.

79.     A prudent fiduciary who had conducted a prudent investigation would have concluded that the ESOP was paying more than fair market value for the Kruse-Western stock and/or the debt incurred in connection with the Transaction was excessive.

80.     The valuation report and fairness opinion obtained by GreatBanc for the 2015 ESOP Transaction was not provided to Plaintiff or other the participants of the Western Milling ESOP.

81.     The extreme decline in value of the Company stock owned by the ESOP following the 2015 ESOP Transaction should have caused GreatBanc as well as Defendant Kruse, the Board Defendants and/or the Administrator, at a minimum, to investigate whether the ESOP had paid more than fair market value in the 2015 ESOP Transaction. To the extent that any of the Defendants had conducted such an investigation, that investigation as well as any corrective measures would have been reported in one of the Form 5500s filed with the Department of Labor. As none of the Form 5500s report any such investigation or corrective actions, none of the Defendants investigated whether fiduciary violations had occurred in the 2015 Transaction despite numerous red flags that should have raised concerns.

82.     As a direct and proximate result of the actions of the Defendants related to the 2015 ESOP Transaction, the ESOP and its participants have suffered at least tens of millions of losses in retirement assets, for which all Defendants are jointly and severally liable.

## IV.  CLASS ACTION ALLEGATIONS

83.     Plaintiff brings these claims as a class action pursuant to Fed. R. Civ. P. 23 (a) and (b), on behalf of all participants in the Western Milling ESOP from November 4, 2015 or any time thereafter who vested under the terms of the Plan and those participants' beneficiaries. Excluded from the Class are Defendants and their immediate family, any fiduciary of the Plan; the officers and directors of Kruse-Western (including any of its subsidiaries or affiliates), or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

84.     **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. According to the 2017 Form 5500 filed with the Department of Labor, which is the most recent available Form 5500, as of December 31, 2017, there were 393 participants, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), in the ESOP.

85.     **Commonality.**  The issues of liability are common to all members of the Class and are capable of common answers as those issues primarily focus on Defendants' acts (or failure to act). Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

a.     Whether Defendants engaged in a prohibited transaction under ERISA by permitting the ESOP to purchase Kruse-Western stock from the Selling Shareholders for more than adequate consideration in the 2015 ESOP Transaction;

b.     Whether GreatBanc engaged in a prudent investigation of the proposed purchase of Kruse-Western stock by the ESOP in the 2015 ESOP Transaction;

c.     Whether GreatBanc breached a fiduciary duty to ESOP participants by causing the ESOP to purchase Kruse-Western stock in 2015 for more than fair market value;

d.     Whether the Board Defendants breached their fiduciary duties by failing to adequately monitor GreatBanc and the Administrator;

e.     The amount of losses suffered by the ESOP as a result of Defendants' fiduciary violations and/or other appropriate remedial and equitable relief.

86.     **Typicality.**  Plaintiff's claims are typical of those of the Class because their claims arise from the same event, the sale of the Company to the Western Milling ESOP. Specifically, Plaintiff challenges the legality of a plan-wide transaction, whereby stock is allocated to all participants' accounts based on the same valuation of the Company. As a result, Plaintiff, like other ESOP participants in the Class, has received less in his ESOP account based on the same purchase price of Kruse-Western stock, and continues to suffer such losses because Defendants have failed to correct the overpayment by the ESOP and the ESOP and the Company are burdened with excessive debt.

87.     Because Plaintiff seeks relief on behalf of the Western Milling ESOP pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), his claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class member.

88.     **Adequacy.**  Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class. He understands that this matter cannot be settled without the Court's approval.

89.     Defendants do not have any unique defenses that would interfere with Plaintiff's representation of the Class.

90.     Plaintiff has retained counsel competent and experienced in complex class actions, ERISA and employee benefits litigation, and with particular experience and expertise in ESOP litigation.

91.     **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the ESOP and their participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the ESOP.

92.     **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(B).  Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the ESOP, engaged in prohibited transactions with respect to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the ESOP even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

93.     **Rule 23(b)(2).**  Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the Class as a

whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

94.    **Rule 23(b)(3).** Additionally, and alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. Plaintiff and all Class members have been harmed by the ESOP paying more than fair market value for Kruse-Western stock in the 2015 ESOP Transaction. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

95.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims are brought on behalf of the ESOP, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire ESOP. The losses suffered by individual Class members are small compared to the expense and burden of individual prosecution of this action. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the ESOP.

96.    The following factors set forth in Rule 23(b)(3) also favor certification of this case as a class action:

a)    The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b)      No other litigation concerning this controversy has been filed by any other members of the Class.

c)      This District is the most desirable location for concentrating the litigation for reasons that include (but are not limited to) the following: (i) the ESOP is administered in part in this District, (ii) certain Defendants can be found in this District, and (iii) certain non-party witnesses are located in this District.

97.     The names and addresses of the Class are available from the ESOP. Notice will be provided to all members of the Plaintiff Class to the extent required by Rule 23.

## COUNT I

**Prohibited Transaction in Violation of ERISA § 406(a), 29 U.S.C. § 1106(a)**

(Against Kevin Kruse, Does 21-30, and GreatBanc)

98.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

99.     ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

100.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include any fiduciary … of such employee benefit plan", and "an employee, officer or director or a 10 percent or more shareholder" of an employer covered by the Plan. 29 U.S.C. § 1002(14)(A), (H).

101.    Each of the Selling Shareholders were employees, officers or directors of the Company, or shareholders with a 10% or more interest in the Company, or relatives of such persons at the time of the Sale of their stock to the ESOP. As such, Defendant Kevin Kruse and the other Selling Shareholders are "parties in interest" within the meaning of ERISA § 3(14).

102.    ERISA § 408(e), 29 U.S.C. § 1108(e), provides a conditional exemption from the prohibited transaction rules for sale of employer securities to or from a plan if a sale is made for adequate consideration. The burden is on the fiduciary and the parties-in-interest to demonstrate that conditions for the exemption are met.

103.     ERISA § 3(18)(B) defines adequate consideration as "the fair market of the asset as determined in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18)(B). ERISA § 3(18)(B) requires that the fiduciary or party-in-interest show that the price paid reflected the fair market value of the asset at the time of the transaction, and that the fiduciary conducted a prudent investigation to determine the fair market value of the asset.

104.     As Trustee, GreatBanc caused the Western Milling ESOP to engage in a prohibited transaction in violation of ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D), by approving the transaction for more than fair market value and for failing to ensure that the ESOP paid no more than fair market value for the Western-Kruse stock purchased in the 2015 ESOP Transaction. Specifically, the ESOP paid more than fair market value for shares sold by the Selling Shareholders.

105.     Kevin Kruse as President of the Company knew that the valuation was based on inflated revenue, earnings and cash flow projections that did not adequately take into consideration the Company's monensin contamination problems and potential wage and hour liability.

106.     On information and belief, the other Selling Shareholders also held leadership and/or management positions within the Company and thus likewise knew that the valuation was based on inflated revenue, earnings and cash flow projections.

107.     All the Selling Shareholders participated in the sale of the Company as they were parties to the 2015 ESOP Transaction and received in total $244 million in cash and loans from the ESOP for the Company stock they sold.

108.     As such, the Selling Shareholders (Kevin Kruse and Does 21-30) were aware of sufficient facts that the 2015 ESOP Transaction constituted a prohibited transaction with parties-in-interest. As parties-in-interest, the Selling Shareholders are liable for the violations of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D).

109.     As detailed in the allegations above, the ill-gotten proceeds received from the ESOP Transaction were deposited in the personal accounts of the Selling Shareholders and remain in their possession. Plaintiff seeks appropriate equitable relief from the Selling Shareholders as parties in

interest, including the disgorgement of any ill-gotten gains they received in connection with the ESOP Transaction.

## COUNT II

### Prohibited Transaction in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)

(Against All Administration Committee Members Who Sold Kruse-Western Stock to the ESOP)

110.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

111.   ERISA § 406(b), 29 U.S.C. § 1106(b), prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account[.]" 29 U.S.C. § 1106(b)(1).

112.   As alleged above, the Plan Document establishes that the Administrator of the ESOP had and has discretionary control over the management of the ESOP at all times since its inception.

113.   As such, the Administration Committee Members were and continue to be fiduciaries of the Western Milling ESOP before and after the 2015 ESOP Transaction.

114.   Any Administration Committee Members who sold shares of Kruse-Western stock to the ESOP in the 2015 ESOP Transaction (the "Selling Committee Members") dealt with the ESOP assets in their own interest within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

115.   ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants[.]" 29 U.S.C. § 1106(b)(2).

116.   All Selling Committee Members had fiduciary control over the ESOP and acted as an adverse party to the ESOP in the 2015 ESOP Transaction within the meaning of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

117.   ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits a plan fiduciary from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

118.   All Selling Committee Members received consideration for their own personal accounts in the 2015 ESOP Transaction within the meaning of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

119.    All Selling Committee Members continue to act in a self-dealing manner and receive consideration for their own personal accounts in violation of § 406(b)(1) and (b)(3) because, on information and belief, they continue to use their discretion as Plan Administrator to determine what portion of the participants' stock dividends and employer contributions, held in the ESOP, are used to provide accelerated loan payments to themselves given that they are also the note holders on the ESOP's transaction debt.

120.    All Selling Committee Members violated ERISA §§ 406(b)(1)-(3), 29 U.S.C. §§ 1106(b)(1)-(3), for which they are liable as fiduciaries to restore the losses caused by these prohibited transactions, to disgorge profits or other appropriate remedial and equitable relief.

**COUNT III**
**Breach of Fiduciary Duties Under ERISA §§ 404(a)(1)(A) and (B),**
**29 U.S.C. §§ 1104(a)(1)(A) and (B)**

(Against GreatBanc)

121.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

122.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires that a plan fiduciary act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan."

123.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires that a plan fiduciary act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

124.    In the context of a sale of the sponsoring company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to ensure that the ESOP and its participants pay no more than adequate consideration for the ESOP's assets and the participants' account in the ESOP.

125.    Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

126.     GreatBanc was required to undertake an appropriate and independent investigation of the fair market value of the Kruse-Western stock before approving the 2015 ESOP Transaction in order to fulfill its fiduciary duties. Among other things, GreatBanc was required to conduct a thorough and independent review of any "independent appraisal," to make certain that reliance on any and all valuation experts' advice was reasonably justified under the circumstances of the 2015 ESOP Transactions; to investigate the credibility of the management assumptions and earnings projections underlying the valuation, and to make an honest, objective effort to read and understand the valuation reports and opinions and question the methods and assumptions that did not make sense.

127.     An appropriate investigation would have revealed that the valuation used for the 2015 ESOP Transaction and the $244,130,400 price ultimately paid by the ESOP did not reflect the fair market value of the Kruse Western stock purchased by the ESOP.

128.     An appropriate investigation would have revealed that it was imprudent for the ESOP to take on excessive debt.

129.     An appropriate investigation would have revealed that purchasing the Company for $244,130,400 was not in the best interest of the ESOP participants.

130.     After the 2015 ESOP Transaction, GreatBanc was obligated to remedy the ESOP's overpayment for Kruse-Western stock, including as necessary correcting the prohibited transaction by attempting to restore the amount overpaid by the ESOP to the Selling Shareholders back to the ESOP, including, if necessary, by filing a lawsuit on behalf of the ESOP.

131.     By causing the ESOP to engage in the 2015 ESOP Transaction, and failing to restore the losses caused thereby, GreatBanc breached its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B) and caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

**COUNT IV**
**Failure to Monitor in Violation of ERISA §§ 404(a)(1)(A) and (B)**
**29 U.S.C. §§ 1104(a)(1)(A) and (B)**

(Against Kevin Kruse, the Board of Directors, and Does 1-10)

132.     Plaintiff incorporates the preceding paragraphs as though set forth herein.

133.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires that a plan fiduciary act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan."

134.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires that a plan fiduciary act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

135.    ERISA § 404(a)(1)(A) and (B) provide that any fiduciary with the power to appoint and/or remove other fiduciaries has an obligation to undertake an appropriate investigation that the appointed fiduciary is qualified to serve in the position as fiduciary and to monitor the appointed fiduciary to ensure that he/she remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.  If the appointed fiduciary has violated or continues to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and attempt to restore any losses to the plan caused by the ERISA violations.

136.    The ESOP Plan Document provides that GreatBanc was appointed by the Board of Directors. Thus, the Board Defendants had a duty to monitor GreatBanc.

137.    The ESOP Plan Document provides that the Administrator is appointed by the Board of Directors. Thus, the Board Defendants also had a duty to monitor the Administrator.

138.    The Board Defendants breached their duties under ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) &(B) because they failed to monitor GreatBanc and the Administrator to ensure that the ESOP did not engage in the 2015 ESOP Transaction given the inflated stock price, and/or that the ESOP paid no more than fair market value for Company stock in the Transaction, and/or that GreatBanc took remedial action after the 2015 ESOP Transaction.

## COUNT V

### Co-Fiduciary Liability Under ERISA §§ 405(a)(1) and (a)(3),

### 29 U.S.C. §§ 1105(a)(1) and (a)(3)

(Against Kevin Kruse, the Administration Committee, the Board of Directors, and Does 1-20)

139.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

140.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" [] "if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary[.]"

141.    Because Kevin Kruse and the Administration Committee (and its individual members) held management and leadership positions within the Company, (i) they were involved in preparing the revenue, earnings and cash flow projections underlying the valuation relied upon by GreatBanc that resulted in the ESOP overpaying for the Company stock it purchased; (ii) they knew about the Company's long-standing and persistent problems related to monensin contamination in its animal feed and the failure of the financial projections to adequately reflect these problems; and (iii) they knew that the incorrect financial projections they prepared would be used to determine the value the ESOP would pay for Company stock and thus cause the ESOP to overpay.

142.    Thus, Kevin Kruse, the Administration Committee and its individual members knowingly participated in the fiduciary violations of GreatBanc alleged above, and they knew that GreatBanc's actions violated ERISA. As such, under ERISA § 405(a)(1)), 29 U.S.C. § 1105(a)(1), they are liable as co-fiduciaries for the ESOPs losses as a result of GreatBanc's fiduciary violations.

143.    As alleged above, the Board Defendants were involved in and/or directed the preparation of the financial projections underlying the valuation relied upon by GreatBanc in determining the purchase price the ESOP paid for the Company.

144.    Thus, the Board Defendants knowingly participated in the fiduciary violations by GreatBanc, which relied on those financial statements and projections in agreeing to the price the ESOP paid for Kruse-Western stock, and they knew GreatBanc's actions violated ERISA. As such, under ERISA § 405(a)(1)), 29 U.S.C. § 1105(a)(1), the Board Defendants are liable as co-fiduciaries for the ESOPs losses as a result of GreatBanc's fiduciary violations.

145.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" [] "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

146.     Because Kevin Kruse and the Administration Committee members held management positions at the Company, they knew of the problems with monensin contamination of Western Milling's feed prior to the 2015 ESOP Transaction as well as the Company's potential liability for wage and hour violations. Given their role in the preparation of financial statements and projections, they also knew that the financial projections underlying the ESOP's purchase price did not adequately reflect the Company's future revenues, cash flows and earnings. Thus, Kevin Kruse and the Administration Committee (and its individual members) knew that the ESOP overpaid for the Company stock.

147.     As such, Kevin Kruse and the Administration Committee (and its individual members) knew that GreatBanc committed fiduciary violations in approving the ESOP Transaction.

148.     Kevin Kruse and the Administration Committee (and its individual members) failed to make reasonable efforts to remedy fiduciary violations associated with the ESOP's overpayment for the Kruse-Western stock.

149.     For example, Kevin Kruse and the Administration Committee (and its individual members) could have asked GreatBanc, the Selling Shareholders or insurers to restore the amount of the overpayment to ESOP participants. And because Kevin Kruse and some of the Administration Committee members themselves sold Company stock to the ESOP, they could have simply returned the overpayment they received.

150.     At a bare minimum, Kevin Kruse and the Administration Committee could have brought the matter to the attention of the Secretary of Labor.

151.     Yet Kevin Kruse and the Administration Committee (and its members) took no actions and made no efforts to remedy GreatBanc's fiduciary violations and thus are liable as co-fiduciaries for the losses caused to the ESOP by GreatBanc's fiduciary violations pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3).

152.     As alleged above, the Board Defendants knew of the Company's problems with monensin contamination and its potential liability for wage and hour violations prior to the 2015 ESOP Transaction.

153.    Because the Board Defendants were involved in the preparation, review and approval of the Company's financial statements and projections as part of their corporate oversight, they also knew that the financial projections management provided to the valuation firm for the ESOP Transaction did not adequately reflect the Company's future revenues, cash flows and earnings because they did not adequately reflect the potential liability from the monensin contamination and the wage and hour violations.

154.    As such, the Board Defendants knew of GreatBanc's fiduciary violations.

155.    Despite this knowledge, the Board Defendants' failed to take reasonable steps to remedy GreatBanc's fiduciary violations ERISA, including using their power to remove GreatBanc as Trustee; using their power over the Company's management and executives to correct the unreasonable financial projections; and using their power over GreatBanc and other Defendants to restore to the ESOP the value of its overpayment for Kruse-Western stock. And because some of the Board Defendants themselves sold Company stock to the ESOP, they could have simply returned the overpayment they received.

156.    At a bare minimum, the Board Defendants could have brought the matter to the attention of the Secretary of Labor.

157.    Yet the Board Defendants took no actions and made no efforts to remedy GreatBanc's fiduciary violations. Accordingly, each Board Defendant is liable as a co-fiduciary for the losses caused to the ESOP by GreatBanc's fiduciary violations. ERISA §§ 405(a)(3), 29 U.S.C. §§ 1105(a)(3).

## V.   PRAYER FOR RELIEF

Plaintiff on behalf of himself and the Class, prays that judgment be entered against Defendants on each Count and that the Class be awarded the following relief:

A.    Declare that Defendants have each breached their fiduciary duties under ERISA;

B.    Declare that Defendants GreatBanc, Kevin Kruse, and Does 21-30 have each engaged in prohibited transactions in violation of ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), through the 2015 ESOP Transaction;

C.      Enjoin GreatBanc, the Administrator and the Board Defendants from further violations of their fiduciary responsibilities, obligations and duties;

D.      Remove GreatBanc as the Trustee of the Western Milling ESOP and/or bar it from serving as a fiduciary of the ESOP in the future;

E.      Appoint a new independent fiduciary to manage the Western Milling ESOP and order the costs of such independent fiduciary be paid for by Defendants;

F.      Order each fiduciary found to have violated ERISA, including breaching his/her/its fiduciary duties to the ESOP, to jointly and severally pay such amount to restore all the losses resulting from their breaches and to disgorge all profits made through use of assets of the ESOP;

G.      Order that Defendants provide other appropriate equitable relief to the ESOP, including but not limited to forfeiting their ESOP accounts, providing an accounting for profits, surcharge, or imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

H.      Order Defendants to provide all accountings necessary to determine the amounts Defendants must remit to the ESOP to restore losses and to disgorge any profits fiduciaries obtained from the use of ESOP assets or other violations of ERISA § 404 and 406, 29 U.S.C. § 1104 and 1106;

I.      To the extent necessary, issue an injunction or order creating a constructive trust into which all ill-gotten gains, fees and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the ESOP; s participants and beneficiaries.  This includes, but is not limited to, the ill-gotten gains, fees and/or profits paid to any of the Defendants that have been wrongly obtained as a result of breaches of fiduciary duty or prohibited transactions or other violations of ERISA;

J.      Order pursuant to ERISA § 206(d)(4) that any amount to be paid to the ESOP accounts of the Class can be satisfied by using or transferring any breaching fiduciary's ESOP account in the Plan (or the proceeds of that account) to the extent of that fiduciary's liability.

K.      Require Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or order payment of fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the Class;

L.      Issue a preliminary and permanent injunction barring Defendants and each of them from seeking to enforce any indemnification agreement between Defendants and the ESOP or Kruse-Western; and declare that any such indemnification agreement violates ERISA § 410, 29 U.S.C. § 1110, and is therefore null and void;

M.      Order Defendants and each of them to reimburse the ESOP or Kruse-Western for any money advanced by the ESOP or Kruse-Western, respectively, under any indemnification agreement or other instrument between Defendants and the ESOP or Kruse-Western;

N.      Order that Defendants and each of them provide other appropriate equitable relief to the ESOP, including but not limited to rescission, surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

O.      Award pre-judgment interest and post-judgment interest; and

P.      Award such other and further relief that the Court determines that Plaintiffs and the Class are entitled to pursuant to ERISA § 502(a)(2) and/or § 502(a)(3), 29 U.S.C. § 1132(a)(2) and/or 1132(a)(3) or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or that is equitable and just.

DATED: August 16, 2019                    Respectfully Submitted,


By: ___/s/ Nina Wasow_____
Nina Wasow

Daniel Feinberg (SBN No. 135983)
Nina Wasow (SBN No. 242047)
FEINBERG, JACKSON, WORTHMAN
& WASOW, LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994

dan@feinbergjackson.com
nina@feinbergjackson.com

Michelle C. Yau
Mary J. Bortscheller
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W. Suite 500
Washington, D.C. 20005
Tel. (202) 408-4600
Fax (202) 408-4699
myau@cohenmilstein.com
mbortscheller@cohenmilstein.com

*Counsel for Plaintiff and the Proposed Class*