1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ARMANDO ZAVALA,                    No.  1:19-cv-00239-DAD-SKO

12              Plaintiff,

13        v.                            ORDER GRANTING IN PART AND
                                        DENYING IN PART DEFENDANTS'
14   KRUSE-WESTERN, INC., et al.,       MOTIONS TO DISMISS

15              Defendants.             (Doc. Nos. 38, 46)

16

17

18        This matter is before the court on the separate motions brought on behalf of defendant

19   Kevin Kruse and defendants the Kruse-Western, Inc. Board of Directors and Administration

20   Committee (collectively, "defendants"), filed on August 30, 2019 and September 24, 2019, to

21   dismiss plaintiff's first amended complaint.[1]  (Doc. Nos. 38-1, 46-1.)

22   /////

23

24   ───────────────────────
     [1]  The undersigned apologizes to the parties for the excessive delay in the issuance of this order.
25   This court's overwhelming caseload has been well publicized and the long-standing lack of
     judicial resources in this district long-ago reached crisis proportion.  That situation, which has
26   continued unabated for twenty-two months now, has left the undersigned presiding over
     approximately 1,300 civil cases and criminal matters involving 732 defendants at last count.
27   Unfortunately, that situation sometimes results in the court not being able to issue orders in
     submitted civil matters within an acceptable period of time. This situation is frustrating to the
28   court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

                                       1

On November 5, 2019, the motions to dismiss came before the court for hearing. Attorney Nina R. Wasow appeared on behalf of plaintiff Armando Zavala. Attorneys Lynn Calkins, David Litman, and Chelsea McCarthy appeared on behalf of defendants. Having reviewed the parties' briefing and heard oral argument, and for the reasons set forth below, the court will grant both of the defendants' motions to dismiss in part.

## BACKGROUND

**A.    Factual Background**

This case arises from the sale of Kruse-Western, Inc.'s ("Kruse-Western") stock to the Western Milling Employee Stock Ownership Plan (the "ESOP"). According to the allegations of plaintiff's first amended complaint, Western Milling, LLC ("Western Milling") is a milling and feed manufacturer, and at all relevant times manufactured Western Blend Horse Feed and other animal feed blends. (Doc. No. 34 ("FAC") at ¶¶ 27, 28.) In some instances, manufacturing animal feed for different animals requires segregating the feeds from one another. (*Id.* at ¶¶ 29, 40.) As relevant here, an antibiotic known as monensin can be added to unmedicated cattle and poultry feed, but that same antibiotic is toxic to horses. (*Id.* at ¶ 29.) At some time between December 2009 and July 2010, the United States Food and Drug Administration discovered "impermissibly high" quantities of monensin in Western Milling's feed samples. (*Id.* at ¶ 30.) Western Milling subsequently issued a recall of its turkey feed in 2010 and 2011, and a recall of its horse feed in 2011 due to monensin contamination. (*Id.*) In September 2015, 21 horses died and many others became ill in Clovis, California due to monensin poisoning caused by Western Blend Horse Feed. (*Id.* at ¶ 31.) That same month, Western Milling issued a recall of its Western Blend Horse Feed due to possible contamination. (*Id.* at ¶ 32.) In 2016, the same facility that manufactured the tainted horse feed improperly mixed monensin into medicated cattle feed, rendering the medicated cattle feed dangerous and contributing to the deaths of several dairy calves. (*Id.* at ¶ 33.)

In February 2016, Western Milling was named as a defendant in an action filed in the Fresno County Superior Court, and ultimately agreed to pay $2.4 million to the plaintiffs in that action to settle claims arising from monensin poisoning caused by its horse feed. (*Id.* at ¶ 34.) In

1   addition, the California Department of Food and Agriculture fined Western Milling $726,000.00

2   and revoked their commercial feed license "for repeated and multiple violations."  (*Id.* at ¶ 35.)

3   Western Milling separately paid over $2 million to settle claims brought by the owners of cattle

4   that consumed excessively high levels of monensin in 2014, including more than 850 cattle that

5   died as a result of consuming Western Milling feed. [2]  (*Id.* at ¶ 36.)

6        In September 2016, an additional 87 calves died and others became sick after consuming

7   monensin-contaminated feed produced by Western Milling.  (*Id.* at ¶ 37.)  Western Milling

8   discontinued the manufacture of horse and specialty feeds at its Goshen, California plant and

9   contracted out the manufacture of its horse feed.  (*Id.* at ¶ 39.)  Western Milling subsequently

10  spent approximately $5.5 million to construct a new horse feed manufacturing plant separate from

11  its cattle feed plant.  (*Id.*)  In addition to the liabilities noted above, Western Milling and its

12  operating companies faced significant liability due to wage and hour violations at its California

13  facilities.  (*Id.* at ¶ 41.)

14       According to the Articles of Incorporation obtained from the California Secretary of State,

15  Kruse-Western was incorporated on September 11, 2015.  (*Id.* at ¶ 42.)  Kruse-Western, in turn,

16  operates various companies including Western Milling, OHK Transport LLC, OHK Logistics,

17  LLC, and Winema Elevators, LLC.  (*Id.* at ¶ 26.)  The ESOP, created on November 4, 2015, is a

18  pension plan under the Employee Retirement Income Security Act ("ERISA") that is primarily

19  invested in the stock of Kruse-Western.  (*Id.* at ¶¶ 1–2, 44.)  On the same day the ESOP was

20  created, GreatBanc Trust Company ("GreatBanc") caused the ESOP to purchase 100 percent of

21  the outstanding shares of Kruse-Western stock.  (*Id.* at ¶ 57.)  GreatBanc was appointed trustee of

22  the ESOP by defendant Kruse-Western Board of Directors, including defendant Kruse and

23  defendants John and Jane Doe 10–20, the individual members of Board of Directors (the "Board

24  defendants").  (*Id.* at ¶¶ 15, 17.)  The Board defendants also appointed the members of the

25  Administration Committee ("Administration Committee" or "Administrator") as the designated

26

27  [2]  The undersigned has previously addressed these facts in the context of an insurance dispute.
    *See generally Praetorian Ins. v. W. Milling, LLC*, No. 1:15-cv-00557-DAD-EPG, 2017 WL

28  4284717 (E.D. Cal. Sept. 27, 2017).

plan administrator of the ESOP.  (*Id.* at ¶¶ 18, 21.)  The ESOP purchased the outstanding shares from defendant Kruse and John and Jane Doe 20–30 (the "selling shareholders"), which the ESOP financed by borrowing the entire purchase price of $244 million from Kruse-Western.  (*Id.* at ¶¶ 24, 57.)  Kruse-Western, in turn, borrowed the $244 million from the selling shareholders. (*Id.* at ¶ 57.)  The ESOP's purchase of the Kruse-Western shares occurred on November 4, 2015, after the illnesses and deaths of horses in Clovis, California due to monensin poisoning from Western Blend Horse Feed and the recall of the Western Blend Horse Feed in September 2015, but before the filing of the 2016 lawsuit, fines being imposed by the Department of Agriculture, and additional cases of monensin poisoning coming to light.  (*Id.* at ¶¶ 1–2, 31–37, 44.)

Less than two months after the ESOP's purchase of those shares, on December 31, 2015, the value of Kruse-Western had dropped dramatically to $26.6 million.  (*Id.* at ¶ 63.) Subsequently, Kruse-Western was converted to an "S" corporation on January 1, 2016.  (*Id.* at ¶ 43.)  By the end of 2016, that value had fallen still further to $24.8 million.  (*Id.* at ¶ 64.)  By the end of 2017, the value had recovered only marginally to $27.4 million.  (*Id.* at ¶ 65.)  Thus, as of December 31, 2017, the ESOP had purchased Kruse-Western's outstanding stock for almost ten times its actual value.

In his FAC plaintiff alleges that the sale to the ESOP did not adequately reflect the future revenue and earnings of Kruse Western given the recurring monensin contamination of Western Milling's animal feed, nor did it reflect Kruse-Western's potential liability for its wage and hour law violations.  (*Id.* at ¶¶ 69, 72.)  It is also alleged that defendant Kruse, the members of the Administration Committee, and the Board defendants knew of these problems at the time of the sale, but the financial projections used to value Kruse-Western's stock for purposes of the sale did not account for them.  (*Id.* at ¶¶ 56, 70, 71.)

**B.    Procedural Background**

On February 19, 2019, plaintiff filed this action against defendants Kruse-Western, Inc., Kevin Kruse, GreatBanc Trust Company, and Does 1 through 30, inclusive.  (Doc. No. 1.)  On July 26, 2019, following briefing and oral argument by the parties, this court issued an order granting in part defendants' prior motion to dismiss filed on April 15, 2019.  (Doc. Nos. 17, 31.)

1    Pursuant to that order, this court dismissed plaintiff's first cause of action as to the selling

2    shareholder defendants, including defendant Kruse, and dismissed plaintiff's second cause of

3    action for  in its entirety.  (Doc. No. 31 at 17–18.)

4            On August 16, 2019, plaintiff filed his FAC, in which he added the Kruse-Western Board

5    of Directors and the Administration Committee as defendants, and removed Kruse-Western, Inc.

6    as a defendant.  (*See* Doc. No. 34 at ¶¶ 13–16, 21–24.)  In his FAC, plaintiff asserts five claims

7    against defendants under the Employee Retirement Income Security Act ("ERISA") related to the

8    defendants' management and administration of the Western Milling Employee Stock Ownership

9    Plan (the "ESOP").  (*Id.* at 17–25.)  Count one alleges a violation of 29 U.S.C. § 1106(a) against

10   the selling shareholders defendants, defendant Kruse, and defendant GreatBanc, alleging that they

11   engaged in a transaction prohibited by ERISA.  (*Id.* at ¶¶ 98–109.)  Count two alleges a violation

12   of 29 U.S.C. § 1106(b) against the Administration Committee defendants who sold Kruse-

13   Western stock to the ESOP, and also asserts that these individuals engaged in a transaction

14   prohibited by ERISA.  (*Id.* at ¶¶ 110–20.)  Count three alleges that defendant GreatBanc violated

15   29 U.S.C. § 1104(a)(1)(A) and (B) by breaching its fiduciary duties to the ESOP.  (*Id.* at ¶¶ 121–

16   131.)  Count four alleges that the Board defendants and defendant Kruse violated 29 U.S.C.

17   § 1104(a)(1)(A) and (B) by failing to monitor GreatBanc and ensure that the ESOP paid no more

18   than fair market value for the Kruse-Western stock.  (*Id.* at ¶¶ 132–38.)  Count five alleges a

19   claim for co-fiduciary liability in violation of 29 U.S.C. §§ 1105(a)(1), (a)(3) against defendants

20   Kruse, the Administration Committee, the Board of Directors, and the selling shareholders.  (*Id.*

21   at ¶¶ 139–57.)

22           On August 30, 2019, defendant Kruse moved to dismiss the FAC as to the three claims

23   brought against him.  (Doc. No. 38.)  On September 24, 2019, the Board defendants and the

24   Administration Committee moved to dismiss counts two and five of the FAC.  (Doc. No. 46.)

25   Plaintiff filed an opposition to both motions on October 15, 2019, and defendants filed a joint

26   reply thereto on October 22, 2019.  (Doc. Nos. 49, 50.)  On October 29, 2019, plaintiff filed a

27   request for the court to consider a surreply or, in the alternative, to strike arguments defendants

28   /////

1   had raised for the first time in their reply brief, and attached the surreply to the request.  (Doc.

2   Nos. 51, 51-1.)

3        "While [a party] may not raise issues for the first time in her reply brief," a court may

4   remedy the issue by permitting the opposing party to file a surreply to "allow all issues to be

5   determined on the merits." *Garrett v. Astrue*, No. 1:08-cv-1626-DLB, 2009 WL 2905793, at *1

6   (E.D. Cal. Sept. 4, 2009) (citing *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929

7   (9th Cir.2003)).  In the interests of justice and the efficient administration of justice, the court will

8   grant plaintiff's request to consider its surreply addressing the arguments defendants asserted for

9   the first time in their reply brief.

10                                          **LEGAL STANDARD**

11        The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

12   sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

13   1983); Fed. R. Civ. Pro. 12(b)(6).  "Dismissal can be based on the lack of a cognizable legal

14   theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v.*

15   *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege

16   "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

17   550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual

18   content that allows the court to draw the reasonable inference that the defendant is liable for the

19   misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

20        In determining whether a complaint states a claim upon which relief may be granted, the

21   court accepts as true the allegations in the complaint and construes the allegations in the light

22   most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v.*

23   *United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).  However, the court need not assume the truth

24   of legal conclusions cast in the form of factual allegations.  *U.S. ex rel. Chunie v. Ringrose*, 788

25   F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations,

26   "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*,

27   556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a

28   formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also*

1  *Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by

2  mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume that the

3  plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws

4  in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State*

5  *Council of Carpenters*, 459 U.S. 519, 526 (1983).

6                                          **ANALYSIS**

7         Although defendant Kruse and the Board and Administration Committee defendants filed

8  separate motions to dismiss, all defendants contend that the allegations of plaintiff's first

9  amended complaint are insufficient to state a plausible claim as to counts two and five.  (Doc.

10  Nos. 38-1 at 8; 46-1 at 2, 5.)  Defendant Kruse additionally asserts that count one is insufficiently

11  pleaded to state a plausible ERISA claim.  (Doc. No. 38-1 at 4.)  Each of these arguments is

12  addressed in turn below.

13  **A.      First Cause of Action**

14         In his first cause of action plaintiff alleges that defendants selling shareholders, Kruse, and

15  GreatBanc engaged in a prohibited transaction in violation of 29 U.S.C. § 1106(a).  Defendant

16  Kruse argues that this cause of action must be dismissed because, as was the case with plaintiff's

17  original complaint, (1) it fails to assert that defendant Kruse and the selling shareholders were

18  fiduciaries to the ESOP; (2) it fails to identify specific, traceable funds as required to seek

19  equitable relief;  and (3) the remedies sought in the amended complaint are legal in nature, not

20  equitable.  (*Id.* at 4–7.)

21         The court first addresses whether plaintiff's FAC contains allegations indicating that

22  defendants Kruse and the selling shareholders are themselves fiduciaries to the ESOP.  (Doc. No.

23  38-1 at 5.)  There are two types of fiduciaries under ERISA.  *See Depot*, 915 F.3d at 653.  First, a

24  party is considered a "named fiduciary" if they are designated as such "in the plan instrument."

25  29 U.S.C. § 1102(a)(2); *Depot*, 915 F.3d at 653.  The second type of fiduciary, commonly

26  referred to as a "functional fiduciary" (*Depot*, 915 F.3d at 653), is defined under ERISA as

27  follows:

28  /////

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Of particular relevance to this case, the Ninth Circuit has recognized that under this definition of a fiduciary, "where members of an employer's board of directors have responsibility for the appointment and removal of ERISA trustees, those directors are themselves subject to ERISA fiduciary duties, albeit only with respect to trustee selection and retention." *Johnson v. Couturier*, 572 F.3d 1067, 1076 (9th Cir. 2009). Thus, where a board member is not a "named fiduciary," that board member's fiduciary duties under ERISA are limited.

Here, plaintiff's FAC alleges that "[a]s a result of his membership on the Board of Directors, Mr. Kruse is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a 'party in interest' as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14)." (FAC at ¶ 14.) Plaintiff's counsel asserted at oral argument on the pending motions that the FAC alleges the selling shareholders are both named and functional fiduciaries to the ESOP. However, rather than alleging that the selling shareholders are fiduciaries, the FAC—as in plaintiff's original complaint—instead defines the selling shareholders only as "parties in interest" within the meaning of 29 U.S.C. § 1002(14). (FAC at ¶ 25.) The FAC does, however, allege that the Administration Committee itself is a named fiduciary of the ESOP with authority over the management and disposition of the ESOP's assets. (FAC at ¶¶ 21, 55.) Plaintiff contends both that the Administration Committee and the individual committee members were named fiduciaries, and that the Administration Committee defendants are also functional fiduciaries because they "ha[ve] exercised 'discretionary authority and control' over ESOP management[.]" (Doc. No. 49 at 14, 17–18.) By asserting that the selling shareholders are "the persons serving on the Administration Committee of the ESOP" (the "Administration Committee defendants"), plaintiff has sufficiently alleged that the

8

Administration Committee defendants are at least functional fiduciaries of the ESOP.  The FAC therefore contains sufficient allegations that defendant Kruse is a named fiduciary and the Administration Committee defendants are functional fiduciaries of the ESOP with limited fiduciary duties.  *See Johnson*, 572 F.3d at 1076 (holding that where the board of directors of an ERISA plan has limited control over the plan, its fiduciary duties are likewise limited).

As discussed in this court's prior order, Title 29 U.S.C. § 1332(a)(3) provides "a cause of action to remedy plan or ERISA violations—including prohibited interested-party transactions— with 'appropriate equitable relief.'"  *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 653 (9th Cir. 2019), *cert. denied*, __U.S.__, 140 S. Ct. 223 (2019).  To state such a claim, however, the complaint must contain allegations that the relief sought is equitable rather than legal.  The failure by a plaintiff to seek appropriate equitable relief therefore will warrant dismissal of such a claim.  *See id.* at 659 ("We conclude that the relief plaintiffs seek is not equitable and accordingly affirm the district court's dismissal of plaintiffs' prohibited transaction claim.").  Thus, whether plaintiff here has stated a cognizable cause of action against the selling defendants turns on whether plaintiff's operative complaint seeks equitable relief.

"[T]he term 'equitable relief' . . . is limited to 'those categories of relief that were *typically available in equity*' during the days of the divided bench (meaning, the period before 1938 when courts of law and equity were separate)."  *Montanile v. Bd. of Trs.*, 577 U.S. 136, 142, (2016) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)).  The label a plaintiff attaches to a particular form of relief is not dispositive; rather, whether a remedy is legal or equitable "depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought."  *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363 (2006) (internal quotation marks and brackets omitted); *see also Mathews v. Chevron Corp.*, 362 F.3d 1172, 1185 (9th Cir. 2004) ("In determining whether an action for equitable relief is properly brought under ERISA, we look to the substance of the remedy sought.").

In the specific context of ERISA claims, whether the relief sought can be characterized as legal or equitable turns on whether the money or property sought is "in the defendants' possession."  *See Depot*, 915 F.3d at 661.  To that end, the Ninth Circuit in *Depot* set forth three

1   methods by which a plaintiff could allege that the money or property is in the possession of

2   defendants and therefore state a claim under § 1132(a)(3).  First, a plaintiff may "identif[y] a

3   specific fund to which they are entitled."  *Id.* at 662.  Second, a complaint may allege "the

4   existence of a general account in which the ill-gotten funds . . . were commingled, such that the

5   product of those funds would be traceable."  *Id.* at 663.  And third, a plaintiff may allege that

6   defendants' account balance remained above the surcharge amounts for purposes of the "lowest

7   intermediate balance" theory.[3]  *Id.*  The Ninth Circuit in *Depot* reasoned that absent such

8   allegations, "a judgment in plaintiffs' favor would have no connection to any particular fund

9   whatsoever.  Defendants would simply be required to pay a certain amount of money, and they

10  could satisfy that obligation by dipping into any pot they like."  *Id.* at 662 (internal quotation

11  marks omitted); *see also Montanile*, 136 S. Ct. at 658–59 (noting that "[e]quitable remedies are,

12  as a general rule, directed against some specific thing; they give or enforce a right to or over some

13  particular thing rather than a right to recover a sum of money generally out of the defendant's

14  assets") (internal quotation marks and ellipses omitted).

15          In this case plaintiff's FAC sufficiently alleges that the money is in the possession of

16  defendants and therefore adequately states a claim under § 1132(a)(3).  In this regard, the FAC

17  alleges that each of the selling shareholders, including defendant Kruse, "deposited his/her share

18  of the proceeds from the ESOP Transaction in his/her personal account and each such account

19  continues to exist in the possession of the Selling Shareholders" and that "the balance of each of

20  the personal accounts into which the ESOP Transaction proceeds were deposited have remained

21  above the amount of the total proceeds deposited therein."  (FAC at ¶¶ 59–60, 109.)  Plaintiff

22  _____

23  [3]  The Ninth Circuit has explained this "lowest intermediate balance" theory as follows:

24              Where a wrongdoer mingles another's money with his own, from
            which commingled account withdrawals are from time to time made,
            there is a presumption of law that the sums first withdrawn were

25          moneys of the tortfeasor.  If the amount on deposit is depleted below
            the amount of the trust, however, the amount withdrawn is treated as

26          lost, and subsequent deposits do not replenish the trust.  Thus, the
            beneficiary is entitled to the lowest intermediate balance between the

27          date of the commingling and the date of payment.

28  *In re R & T Roofing Structures & Commercial Framing, Inc.*, 887 F.2d 981, 987 (9th Cir. 1989).

1    seeks disgorgement "of any ill-gotten gains [defendants] received in connection with the ESOP

2    Transaction" that were allegedly "deposited in the personal accounts of the Selling Shareholders

3    and remain in their possession.) (*Id.* at ¶ 109.)

4         Defendant Kruse urges the court to find that these allegations are insufficient to "identify

5    a specific, traceable fund" and are thus insufficient to state a claim under *Depot.* (Doc. No. 38-1

6    at 6 n.4.) Citing to several district court decisions, defendant Kruse also argues that because

7    plaintiff's allegations on this issue are made only on information and belief, plaintiff "lacks 'a

8    good faith basis for his allegations[.]'" (*Id.* at 6.) Furthermore, in his reply brief, defendant

9    Kruse emphasizes that the FAC alleges the ESOP borrowed the entire amount needed to fund the

10   stock purchase price from Kruse-Western, "which, in turn, borrowed that amount from the Selling

11   Shareholders," such that there now exists no specific, traceable fund in which the purchase price

12   of the Kruse-Western shares was deposited. (Doc. No. 50 at 5–6; FAC ¶¶ 57–58.) The court

13   finds these arguments unpersuasive.

14        As this court previously noted, the following information is likely to be unavailable to

15   plaintiff in the absence of discovery: the identity of a specific fund, whether particular assets

16   were commingled in a general account, and whether defendants' account balances remained

17   above a specific dollar amount. (*See* Doc. No. 31 at 10 n.3.) Here, in accordance with the Ninth

18   Circuit's decision in *Depot*, the FAC alleges that the money sought is contained in accounts in the

19   possession of the defendants. *See Depot*, 915 F.3d at 661. Although the FAC does allege that the

20   purchase price amount was borrowed by the ESOP from the selling shareholders through Kruse-

21   Western, it does not necessarily follow that the lending resulted in the selling shareholders

22   "receiv[ing] no cash" for the sale of their stock as defendant contends. (*See* Doc. No. 50 at 5–6;

23   FAC at ¶¶ 58–59.) There are no allegations that the only compensation that the selling

24   shareholders received were promissory notes or that each selling shareholder loaned the exact

25   value of the purchase price for their shares, as would be necessary for none of the selling

26   shareholders to have received money deposited into their accounts. Rather, the FAC explicitly

27   alleges that the proceeds of the sale were deposited into the selling shareholders' individual

28   accounts. (FAC at ¶¶ 58–59, 109.)

11

1    Nor does defendant's argument that pleading upon information and belief is insufficient to

2    state a claim entitle them to prevail on the pending motion to dismiss.  "The *Twombly* plausibility

3    standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief

4    where the facts are peculiarly within the possession and control of the defendant or where the

5    belief is based on factual information that makes the inference of culpability plausible."  *Soo Park*

6    *v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017), *cert. denied*, __U.S.__, 138 S. Ct. 642 (2018).

7    Here, the specific identity of defendants' accounts and their account balances are "peculiarly

8    within the possession and control of the defendant[s]" and can likely be ascertained through

9    discovery.  *Id.*

10    Defendant Kruse's motion to dismiss plaintiff's first cause of action will therefore be

11    denied.

12    **B.      Second Cause of Action**

13    Plaintiff's second cause of action, alleged under 29 U.S.C. § 1106(b), is brought against

14    all Administration Committee defendants who sold Kruse-Western stock to the ESOP.  As with

15    his first cause of action, in the second cause of action plaintiff alleges a prohibited transaction in

16    violation of ERISA.  Title 29 U.S.C. § 1106(b) contains various prohibitions on transactions

17    between a plan and a fiduciary of that plan, including transactions that involve acts of self-dealing

18    by the fiduciary.  The parties agree that a cause of action alleging a violation of that provision

19    must allege that the defendants are themselves fiduciaries.  They disagree, however, as to whether

20    the allegations of the first amended complaint plausibly allege that the Administration Committee

21    defendants are fiduciaries.  (*See* Doc. Nos. 38-1 at 8; 46-1 at 2–3; 49 at 14.)  Defendants also

22    assert that any allegation that the Administration Committee defendants sold Kruse-Western stock

23    to the ESOP at all is speculative, such that this cause of action must therefore be dismissed.  (Doc.

24    No. 46-1 at 3.)

25    As discussed above, there are two types of fiduciaries under ERISA:  named fiduciaries

26    designated as such in the plan instrument, and functional fiduciaries defined as follows:

27
          [A] person is a fiduciary with respect to a plan to the extent (i) he
          exercises any discretionary authority or discretionary control
28        respecting management of such plan or exercises any authority or

control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A); *see also* 29 U.S.C. § 1102(a)(2); *Depot*, 915 F.3d at 653.  Thus, where a board member is not a "named fiduciary," and his or her discretionary authority or discretionary control over the management of the plan is limited, that board member's fiduciary duties under ERISA are limited.  *Johnson*, 572 F.3d at 1076.

Defendants argue that plaintiff has "failed to offer any factual allegations that demonstrate that any [Administration Committee] member who sold stock was acting in the capacity of a 'functional fiduciary' at the time" of the sale of shares to the ESOP.  (Doc. Nos. 38-1 at 10; 46-1 at 3.)  Defendants contend that in amending his complaint plaintiff merely substituted the Administration Committee defendants in place of the Board defendants from plaintiff's original complaint, which was dismissed in this court's prior order because the original complaint gave "the reader no indication of what it is the Board defendants did that caused the transaction to occur."  (Doc. Nos. 38-1 at 10; 46-1 at 4; 31 at 13.)

In his FAC plaintiff alleges that the Administration Committee itself is a named fiduciary of the ESOP with authority over the management and disposition of the ESOP's assets.  (FAC at ¶¶ 21, 55.)  In opposing dismissal, plaintiff argues both that the Administration Committee and the individual committee members were named fiduciaries and that the Administration Committee defendants are also functional fiduciaries because they "ha[ve] exercised 'discretionary authority and control' over ESOP management[.]"  (Doc. No. 49 at 14, 17–18.)  Plaintiff contends that his second cause of action "plausibly pleads that the Selling Committee Members had the power to direct GreatBanc in its decision-making for the ESOP" and "effectively controlled the Trustee at all relevant times."  (*Id.* at 18–19.)  Plaintiff asserts that the Administration Committee defendants engaged in self-dealing in violation of 29 U.S.C. § 1106(b) because they "us[ed] their discretion to provide themselves accelerated payments on the ESOP Transaction debt."  (*Id.* at 19.)

13

1    In their reply, defendants contend for the first time that plaintiff's second cause of action

2    should be dismissed because the Trust Agreement specifies that the Trustee may only purchase

3    company stock at fair market values "as determined by the Trustee based upon a valuation by an

4    independent appraiser," and that the Administration Committee defendants therefore held no

5    decision-making power or control as to the purchase price of the Kruse-Western shares and thus

6    no fiduciary duty related to the valuation of the purchase price for those shares.  (Doc. No. 50 at

7    10.)  Defendants thus advance the argument that the Administration Committee defendants could

8    not act in a fiduciary capacity regarding repayments of the ESOP's loan because the ESOP Plan

9    Document directs that *only* the Trustee, and not the Administration Committee, may decide

10   whether to use stock dividends to repay the loan the ESOP used to purchase Kruse-Western stock.

11   (*Id.* at 7–8.)

12   In his sur-reply, plaintiff counters that although the Trust Agreement constitutes improper

13   extrinsic material, the Trust Agreement has no bearing on the Administration Committee's

14   "power to direct GreatBanc to purchase Company Stock using ESOP assets."  (Doc. No. 51-1 at

15   3.)  Plaintiff also argues that the Plan Document grants the Administrator the authority to "direct

16   the Trustee as respects payments or distributions from the Trust in accordance with the provisions

17   of the Plan" and that, in general, the Trustee must first receive authorization from the

18   Administrator in order to act without direction in any aspect except payments to acquisition loans

19   from cash dividends held in the Loan Suspense Account or cash dividends credited to

20   Participants' ESOP Accounts.  (*Id.* at 4–5.)

21   It is important to keep in mind that in determining whether a complaint contains sufficient

22   allegations to survive a motion to dismiss brought under Rule 12(b)(6), "a court *may not* look

23   beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a

24   defendant's motion to dismiss."  *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th

25   Cir. 1998).  Reliance by the court on the Trust Agreement and the ESOP Plan Document in ruling

26   on the pending motions would therefore be inappropriate because those documents were not

27   attached to or incorporated into the FAC, and were attached only to defendants' reply brief in

28   support of the pending motions to dismiss.  The FAC alleges that "for the Trustee to act without

14

direction from the Administrator, it must be authorized to do so by the Administrator in advance"
and that Administration Committee members determine "what portion of the participants' stock
dividends and employer contributions, held in the ESOP, are used to provide accelerated loan
payments to themselves given that they are also the note holders on the ESOP's transaction debt."
(FAC at ¶¶ 54, 114, 119.)  Nevertheless, even if the Administration Committee individual
defendants were functional fiduciaries of the ESOP, the FAC's allegations do not address or
explain how the Administration Committee defendants *caused* the purchase of Kruse-Western
stock to occur such that the purchase of the stock constituted an act of self-interest by the ESOP
fiduciaries.  An allegation of causation is essential to support plaintiff's claim that the
Administration Committee subsequently engaged in self-dealing by fulfilling their duties laid out
in the Plan documents to determine what portion of stock dividends and employer contributions
are directed to loan repayments.  Because no such allegation of facts to, if proven, establish
causation appears in the FAC, plaintiff has failed to sufficiently allege facts stating a claim
against the Administration Committee defendants for violation of 29 U.S.C. § 1106(b).
Therefore, defendants' motion to dismiss will be granted as to plaintiff's second cause of action.
Below, the court turns to the question of whether plaintiff should be granted further leave to
amend.

The court is to "freely give" leave to amend "when justice so requires."  Fed. R. Civ. P.
15(a)(2).  "[L]eave to amend should be granted unless the district court 'determines that the
pleading could not possibly be cured by the allegation of other facts.'"  *United States ex rel. Lee
v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (quoting *Lopez v. Smith*, 203
F.3d 1122 (9th Cir. 2000)).  The Ninth Circuit has "repeatedly stressed that the court must remain
guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the
pleadings or technicalities."  *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003) (internal
quotations and changes omitted).  In evaluating whether leave to amend should be given, the
following factors should be considered:  "bad faith, undue delay, prejudice to the opposing party,
futility of the amendment, and whether the party has previously amended his pleadings."  *Bonin
v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).  "Futility alone can justify the denial of a motion

1   for leave to amend." *Nunes*, 375 F.3d at 808.  *See also Lockheed Martin Corp. v. Network Sols.,*

2   *Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) ("Where the legal basis for a cause of action is tenuous,

3   futility supports the refusal to grant leave to amend.")  Here, it appears plaintiff may be able to

4   address the deficiencies in their allegations in support of their second cause of action identified in

5   this order.  The FAC does not contain allegations as to how the Administration Committee

6   defendants caused the purchase of Kruse-Western stock to occur such that the purchase of the

7   stock constituted an act of self-interest by the ESOP fiduciaries.  However, nothing in the FAC or

8   in the briefing for the pending motions suggests to the court that plaintiff cannot plead additional

9   facts to allege such causation and that would be sufficient to support a claim of self-dealing in

10  violation of ERISA.  Plaintiff's second cause of action of the FAC will therefore be dismissed

11  with further leave to amend being granted.

12  **C.      Fifth Cause of Action**

13          Finally, defendants move to dismiss plaintiff's fifth cause of action in which he asserts

14  that the Board defendants, the Administration Committee defendants, and defendant Kruse

15  violated 29 U.S.C. §§ 1105(a)(1), (a)(3) by knowingly participating in the breach of fiduciary

16  duties (as alleged against GreatBanc in plaintiff's fourth cause of action) and by failing to take

17  reasonable steps to remedy GreatBanc's alleged breach of those duties.  (FAC at ¶¶ 142, 144,

18  148, 155.)

19          A fiduciary is "liable for a breach of fiduciary responsibility of another fiduciary with

20  respect to the same plan" if he "participates knowingly in or knowingly undertakes to conceal, an

21  act or omission of such other fiduciary, knowing such act or omission is a breach," or "if he has

22  knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the

23  circumstances to remedy the breach."  29 U.S.C. §§ 1105(a)(1), (3).  Sections 1105(a)(1) and

24  1105(a)(3) "require actual knowledge of the breach."  *Renfro v. Unisys Corp.*, 671 F.3d 314, 324

25  (3d Cir. 2011).  The defendant fiduciary "must know the other person is a fiduciary with respect

26  to the plan, must know that he participated in the act that constituted a breach, and must know

27  that it was a breach."  *Id.* (quoting *Donovan v. Cunningham*, 716 F.2d 1445, 1475 (5th Cir.

28  1983)).

16

1    Specifically, plaintiff's fifth cause of action alleges that the defendants were involved in

2    preparing the financial projections that GreatBanc relied upon, that defendants knew the financial

3    projections failed to reflect Kruse-Western's monensin contamination issues and wage and hour

4    violations, and that defendants knew the financial projections "would be used to determine the

5    value the ESOP would pay for Company stock and thus cause the ESOP to overpay." (*Id.* at

6    ¶ 141.) Defendants argue in their motion that the FAC fails to sufficiently allege that (1)

7    defendants' alleged actions constitute fiduciary actions sufficient to support a claim of an ERISA

8    violation, and that (2) defendants had actual knowledge of how the financial projections factored

9    into the analysis and knew that GreatBanc breached a fiduciary duty. (Doc. Nos. 38-1 at 11, 46-1

10    at 5–6.)

11    Plaintiff counters that co-fiduciary liability under 29 U.S.C. § 1105 requires only that each

12    of the defendants was a fiduciary to the ESOP in some capacity at the time of GreatBanc's

13    alleged breaches, and that defendants' actions or omissions need not themselves be fiduciary

14    functions. (Doc. No. 49 at 23.) Plaintiff asserts that "the fiduciary duty to monitor is sufficient to

15    give rise to co-fiduciary liability" against the Board Defendants and defendant Kruse because this

16    court previously found that plaintiff adequately pled a failure to monitor claim against those

17    defendants. (*Id.* at 24.) Plaintiff further points out that in his FAC he has alleged that the

18    Administration Committee members were fiduciaries because the Plan Document expressly gives

19    the Administration Committee fiduciary responsibilities, and that in this way they satisfy the

20    threshold requirement for co-fiduciary liability. (*Id.*) Plaintiff also contends that the FAC

21    explicitly alleges that defendants had actual knowledge of GreatBanc's fiduciary violations. (*Id.*

22    at 21.)

23    In reply, defendants argue that plaintiff's conclusory allegations that defendants had actual

24    knowledge of GreatBanc's fiduciary violations cannot survive a motion to dismiss. (Doc. No. 50

25    at 12.) Defendants contend that co-fiduciary liability would require allegations that defendants

26    "*knew* how the projections factored into GreatBanc's analysis about the purchase price of the

27    transaction or *knew* that GreatBanc's treatment of them breached any fiduciary duty." (*Id.* at 13.)

28    Defendants also argue that holding them liable as co-fiduciaries for conduct not within the scope

17

1   of their fiduciary functions would violate the two-hat distinction made in *Pegram v. Herdrich*,

2   530 U.S. 211, 225 (2000), in which the court held that fiduciaries "may wear different hats" and

3   "still take actions to the disadvantage of . . . beneficiaries" when acting in a non-fiduciary role

4   without violating ERISA.

5        In his FAC plaintiff alleges that defendant Kruse, the Board defendants, and the

6   Administration Committee are fiduciaries of the ESOP.  (FAC ¶¶ 14, 15, 21.)  Although the FAC

7   does not allege that the Administration Committee defendants were individually named

8   fiduciaries of the ESOP, it does sufficiently allege that the Administration Committee defendants,

9   by virtue of serving on the Administration Committee, are "functional fiduciar[ies]" pursuant to

10  ERISA by exercising some "discretionary authority or discretionary control over plan

11  management."  29 U.S.C. § 1002(21)(A) (defining functional fiduciaries as individuals who

12  exercise "any discretionary authority or control over plan management" or any control over plan

13  assets).  Despite defendants' arguments to the contrary, a review of the applicable caselaw does

14  not establish that co-fiduciary liability is limited only to instances when the actions underlying the

15  fiduciary's participation in or concealing of the breach or the inaction to remedy the breach

16  themselves amount to fiduciary conduct.  *See, e.g.*, *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d

17  461, 479 (S.D.N.Y. 2005) (holding that "fiduciaries may be liable under § 1105(a) even if their

18  co-fiduciary's breach is beyond the scope of their own discretionary authority") (citing *In re*

19  *WorldCom, Inc. ERISA Litig.*, 354 F.Supp.2d 423, 445 (S.D.N.Y. 2005)); *see also Silverman v.*

20  *Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 106 (2d Cir.1998) (Jacobs, J., concurring) ("Section

21  1105(a)(3) provides for extraordinarily broad liability for co-fiduciaries because it requires only

22  that the defendant be a fiduciary of the same plan as the breaching fiduciary"); *Pizzella v.*

23  *Vinoskey*, 409 F. Supp. 3d 473, 529–30 (W.D. Va. 2019) (finding the defendant liable for a co-

24  fiduciary's breach because he was a fiduciary of the ESOP at the time of the transaction and had

25  actual knowledge that the price he received for selling his shares exceeded fair market value);

26  *Hurtado v. Rainbow Disposal Co.*, No. 8:17-cv-01605-JLS-DFM, 2018 WL 3372752, at *14

27  (C.D. Cal. July 9, 2018) (finding that the co-fiduciary liability claim survived a motion to dismiss

28  "[b]ecause the Court finds that Plaintiffs have stated claims for breach of fiduciary duty as to all

18

Defendants").  Further, defendants' reliance on the decision in *Parsons v. Bd. of Trustees of the Nevada Resort Ass'n - I.A.T.S.E. Loc. 702 Ret. Plan*, No. 2:12-CV-00299-LDG, 2013 WL 5324946 (D. Nev. Sept. 20, 2013) for the proposition that co-fiduciary liability may only apply to conduct within the scope of a fiduciary's own fiduciary functions is misplaced.  The district court in *Persons* held only that in order to allege co-fiduciary liability against the trustee defendants, a plaintiff must allege an underlying breach of fiduciary duty by other fiduciaries.  *Id.* at *8.  That court did not, as defendants argue, hold that a defendant fiduciary may only be liable for a co-fiduciary's breach if the defendant fiduciary engaged in fiduciary conduct to participate in or conceal the co-fiduciary's breach.  *See id.*

Here, plaintiff has sufficiently alleged that defendant GreatBanc breached its fiduciary duties as the ESOP's trustee (*see* Doc. No. 31 at 17), and plaintiff brings the co-fiduciary liability claim against the remaining defendants for GreatBanc's underlying breach of duty.  (FAC at ¶¶ 140, 142.)  Moreover, the court concludes that the FAC sufficiently alleges that defendants knowingly participated in GreatBanc's breach of its fiduciary duty and had actual knowledge of that breach but failed to take reasonable steps to remedy it.  In this regard, plaintiff in his FAC alleges that:  (1) defendant Kruse, the Board defendants, and the Administration Committee defendants were involved in or directed the preparation of the financial projections used by GreatBanc to appraise the value of Kruse-Western stock; (2) defendants knew about Kruse-Western's monensin contamination problems and wage and hour liabilities; (3) defendants also knew that the monensin contamination was not incorporated in the financial projections and that the projections underlying the ESOP's purchase price were therefore clearly inaccurate.  (FAC ¶¶ 56, 70, 141, 143, 146, 152–53.)  Plaintiff claims that defendants' actively engaged in preparing inaccurate financial projections that they knew were to be used by GreatBanc in the valuation of the ESOP purchase price.  This, plaintiff avers, constitutes participation in and actual knowledge of GreatBanc's breach of duty, yet defendants allegedly failed to take any action to remedy that breach. (*Id.* at ¶¶ 142, 144, 147–51, 154–57.)

These allegations support a claim of co-fiduciary liability against defendant Kruse and the Administration Committee defendants.  *See Pizzella*, 409 F. Supp. 3d at 529–30 (finding that a

1  fiduciary's actual knowledge that the price received for selling his shares in the ESOP's exceeded

2  the fair market value of those shares was sufficient to hold him liable as a co-fiduciary).

3  Defendants do not dispute that plaintiff alleges that defendants knew GreatBanc would and did

4  use the allegedly inaccurate financial projections in its valuation, only arguing that they did not

5  know how exactly the projections would be used.  (*See* Doc. No. 50 at 13.)  But plaintiff's

6  allegations that defendants knew of GreatBanc's reliance on the inaccurate projections they had

7  prepared is sufficient to state a cognizable claim.  Although a co-fiduciary liability claim must

8  allege actual knowledge of a co-fiduciary's breach, it "need not allege specific facts buttressing

9  those claims of knowledge to survive a motion to dismiss."  *In re Polaroid ERISA Litig.,* 362 F.

10  Supp. 2d at 479–80 (citing *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 767 n. 15 (S.D.N.Y.

11  2003)); *cf. Renfro*, 671 F.3d at 324 (finding that plaintiff's co-fiduciary liability claims failed

12  because they did not contend that defendant had knowledge about the co-fiduciary's "flawed

13  decision-making process regarding investment options to be included in the plan").  Defendants'

14  arguments as to whether plaintiff has "adequately shown sufficient knowledge to sustain this

15  Count [of co-fiduciary liability] are not appropriate for resolution at the pleading stage."

16  *Hurtado*, 2018 WL 3372752 at *14.

17      Accordingly, defendants' motions to dismiss plaintiff's fifth cause of action will be

18  denied.

19                          **CONCLUSION**

20      For the reasons explained above:

21      1.    Defendants' motions to dismiss (Doc. Nos. 38, 46) are granted in part and denied

22            in part as follows:

23            a.    Plaintiff's second cause of action is dismissed with leave to amend;

24            b.    Defendants' motions are denied in all other aspects; and

25  /////

26  /////

27  /////

28  /////

2.      Within twenty-one days from the date of service of this order, plaintiff is directed
to either file a second amended complaint or notify the court that he intends to
proceed only on the his claims other than the second cause of action asserted in his
FAC.

IT IS SO ORDERED.

Dated:   __**December 13, 2021**__          _____

UNITED STATES DISTRICT JUDGE