Michelle C. Yau (admitted *pro hac vice*)
Mary J. Bortscheller (admitted *pro hac vice*)
Kai Richter (admitted *pro hac vice*)
Laura E. Older (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel. (202) 408-4600
Fax (202) 408-4699
myau@cohenmilstein.com
mbortscheller@cohenmilstein.com
krichter@cohenmilstein.com
lolder@cohenmilstein.com

Daniel Feinberg (SBN No. 135983)
Nina Wasow (SBN No. 242047)
Andrea Obando (SBN No. 312640)
FEINBERG, JACKSON,
WORTHMAN & WASOW LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
Tel. (510) 269-7998
Fax (510) 269-7994
dan@feinbergjackson.com
nina@feinbergjackson.com
andrea@feinbergjackson.com

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARMANDO ZAVALA, JOSE DAVALOS, and PABLO GONZALEZ, individually and on behalf of all others similarly situated, | Case No. 1:19-cv-00239-DAD-SKO |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| GREATBANC TRUST COMPANY, KEVIN KRUSE, THE KRUSE WESTERN BOARD OF DIRECTORS, THE ADMINISTRATION COMMITTEE, TONY CORREIA, THE TONY F. AND MARY A. CORREIA REVOCABLE | |

FAMILY TRUST, ROBERT BERCZYNSKI,
AUBREY MICHAEL, CHAD PINTER,
JEREMY WILHELM, MARK LA BOUNTY,
THE LA BOUNTY FAMILY TRUST, EJNAR
KNUDSEN, THE 2007 KNUDSEN FAMILY
TRUST, RONALD KRUSE, THE RONALD O.
KRUSE FAMILY TRUST, KRUSE
INVESTMENT COMPANY, INC., THE
JEFFREY AND KAREN FONTANELLA
TRUST, JORDYN KRUSE, RYAN KRUSE,
THE DOUGLAS T. KRUSE TRUST, THE
DAVIS FAMILY TRUST, SECAP, THE KRUSE
FEED AND SUPPLY, INC. PROFIT SHARING
PLAN, THE LAMBERT FAMILY
REVOCABLE TRUST, WARREN
HUTCHINGS, DOREEN HUTCHINGS,
SIDNEY EARP, RICHARD EARP, MARK
KREBSBACH, NICKIE KREBSBACH, THE
JOSEPH M. AND DEBRA L. GUENLEY
REVOCABLE LIVING TRUST, THE
HOLDSWORTH FAMILY REVOCABLE
TRUST, DANIEL J. MARTIN, THE KRUSE
FAMILY TRUST, and THE MONTE AND
SUSAN MELLO TRUST,

Defendants.

## I.  INTRODUCTION

1. This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502 (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), by Plaintiffs, on behalf of themselves and other participants and beneficiaries in the Western Milling Employee Stock Ownership Plan ("ESOP" or "Plan") arising out of the sale of Kruse Western, Inc. ("Kruse Western" or "Company") stock to the ESOP for an inflated value and the resulting loss of tens of millions of dollars to the ESOP.

2. The Western Milling ESOP is a pension plan under ERISA that is designed to be and is primarily invested in the stock of the Company. The claims in this action stem from the ESOP's purchase of 100% of outstanding Kruse Western stock in 2015. The ESOP acquired the stock through a multi-step integrated transaction in which Western Milling, LLC ("Western Milling") was reorganized as a wholly-owned subsidiary of Kruse Western, and the owners of Western Milling and Kruse Western were paid a total of $360 million (the "2015 ESOP Transaction").

3. In contravention of their fiduciary duties and ERISA's prohibited transaction rules, the ESOP trustee, GreatBanc Trust Company ("GreatBanc"), and Kevin Kruse and the other members of the Board of Directors orchestrated the sale of the Company (and its underlying stake in Western Milling) to the ESOP for greater than fair market value, and the former owners who sold their ownership interests in the Company and Western Milling (the "Sellers") knowingly participated in and profited from these fiduciary breaches and prohibited transactions with knowledge that their ownership interests were being unlawfully acquired for more than fair market value. The members of the Board of Directors and the Administration Committee of the ESOP also failed to appropriately monitor GreatBanc and ensure that the interests of participants and beneficiaries in the ESOP were protected in the Transaction.

4. As alleged below, the Sellers negotiated an inflated sale price with GreatBanc, which unjustly enriched the Sellers and caused harm to the ESOP and ESOP participants, who are current and former employees of the Company or Western Milling. The purchase price for the 2015 ESOP Transaction failed to adequately account for, among other things, the risk and liabilities associated with the recurrent contamination of animal feed produced by Western Milling. As a result, Plaintiffs

1    and the Class have not received all of the hard-earned retirement benefits to which they are entitled,

2    and have been deprived of their statutory right to loyal and prudent management of the ESOP.

3        5.      Just two months after the 2015 ESOP Transaction, the Kruse Western stock

4    purchased by the ESOP was worth almost 90% less than the ESOP had paid for it.

5        6.      ERISA Sections 409(a), 502(a)(2) & (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) & (a)(3),

6    authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the

7    ESOP. Pursuant to that authority, Plaintiffs bring this action on behalf of all participants in the

8    Western Milling ESOP and their beneficiaries for violations of ERISA §§ 404 and 406, 29 U.S.C.

9    §§ 1104, 1106, and for appropriate equitable and other relief under § 1109 and 1132(a)(2) & (a)(3).

10       7.      **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this

11   action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

12       8.      **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants

13   because they transact business in, and have significant contacts with, the United States, and ERISA

14   § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.

15       9.      **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §

16   1132(e)(2), for at least the following reasons:

        (a)    Defendants may be found in this District, as they transact business in, and/or

17
18              have significant contacts with this District;

19      (b)    Some Defendants reside in this District; and/or

20      (c)    Some of the alleged breaches took place in this District.

21                               **II.  PARTIES**

22   **Plaintiffs**

23       10.     **Plaintiff Armando Zavala** is a former employee of the Company and a participant

24   in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff Zavala worked at

25   Western Milling between 2015 and May of 2018, as a trailer mechanic and a truck loader. At the

26   time he left the Company, Plaintiff Zavala was vested in the ESOP. He currently resides in

27   Porterville, CA.

28

11.     **Plaintiff Jose Davalos** is a former employee of Western Milling and a participant in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff Davalos worked at Western Milling between 2004 and 2021 as a machine operator. At the time he left Western Milling, Plaintiff Davalos was vested in the ESOP. He currently resides in Orosi, California.

12.     **Plaintiff Pablo Gonzalez** is a former employee of Western Milling and a participant in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff Gonzalez worked at Western Milling between 2010 and 2019. At the time he left the Company, Plaintiff Gonzalez was vested in the ESOP. He currently resides in Tulare, California.

**Defendants**

13.     **Defendant GreatBanc Trust Company** is the Trustee of the Western Milling ESOP within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). GreatBanc holds, manages and controls the ESOP's assets. GreatBanc is a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because it exercises discretionary authority or discretionary control respecting management of the ESOP, exercises authority and control respecting management or disposition of the ESOP's assets, and/or has discretionary authority or discretionary responsibility in the administration of the ESOP. Defendant GreatBanc authorized the ESOP's purchase of Kruse Western stock from the Selling Shareholders.

14.     **Defendant Kevin Kruse** is and at all relevant times was the CEO of Western Milling and the Chairman of Kruse Western. Defendant Kruse is and at all relevant times was also a member of the Kruse Western Board of Directors. According to the ESOP Plan Document, the Board of Directors, acting for the Company, appoints the Trustee of the ESOP and the Administrator of the ESOP. As a result of his membership on the Board of Directors, Mr. Kruse is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). In addition, as discussed below, Mr. Kruse is a Trustee of the Kruse Family Trust, which was a WM Member Seller in the first step of the ESOP Transaction, and the majority shareholder of Kruse Investment Company, Inc., which was a KW Selling Shareholder in the second step of the Transaction.

15.    **Defendant Kruse Western Board of Directors**, according to the ESOP Plan Document, appoints the Trustee of the ESOP and the Administration Committee of the ESOP, acting for the Company. The Board of Directors is a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

16.    **Defendant Tony Correia** has been a member of the Kruse Western Board of Directors since October 31, 2015. As a result of his membership on the Board of Directors, Mr. Correia is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Mr. Correia is and at all relevant times was the President of Western Milling and Kruse Western.

17.    **Defendant Robert Berczynski** has been a member of the Kruse Western Board of Directors since October 31, 2015. Mr. Berczynski also was, as of October 31, 2015, the Vice President – Sales at Kruse Western. As a result, Mr. Berczynski is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Mr. Berczynski had a 0.090% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $324,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 1,400 shares of Kruse Western stock, on November 4, 2015.

18.    **Defendant Aubrey Michael** has been a member of the Kruse Western Board of Directors since October 31, 2015. In 2015, Ms. Michael also was the Vice President of Human Resources at Western Milling and Kruse Western. As a result, Ms. Michael is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

19.    **Defendant Chad Pinter** has been a member of the Kruse Western Board of Directors since October 31, 2015. In 2015 Mr. Pinter also was the Executive Vice President and

CFO of Western Milling and the CFO of Kruse Western. As a result, Mr. Pinter is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Mr. Pinter had a 1.095% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $3,942,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 16,500 shares of Kruse Western stock, on November 4, 2015.

20.    **Defendant Jeremy Wilhelm** was a member of the Kruse Western Board of Directors from October 31, 2015 to November 6, 2017. Mr. Wilhelm also was, as of October 31, 2015, the Vice President – Operations at Kruse Western. As a result, Mr. Wilhelm has been at relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Mr. Wilhelm had a 1.200% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $4,320,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 18,100 shares of Kruse Western stock, on November 4, 2015.

21.    **Defendant Mark La Bounty** was a member of the Kruse Western Board of Directors from October 31, 2015 to May 16, 2016. On information and belief, in 2015 Mr. La Bounty was the Chief Operating Officer and General Counsel of Western Milling and the Secretary and General Counsel of Kruse Western. As a result, Mr. La Bounty has been at relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

22.    **Defendant Ejnar Knudsen** was a member of the Kruse Western Board of Directors from October 31, 2015 to February 7, 2017. As a result of his membership on the Board of Directors, Mr. Knudsen has been at relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Mr. Knudsen also acted as the Sellers' Representative in the ESOP Transaction.

23.    **Defendant Ronald O. Kruse** has been a member of the Kruse Western Board of Directors since October 31, 2015. He is Defendant Kevin Kruse's father. As a result of his membership on the Board of Directors, Mr. Kruse is and has been at all relevant times a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21), and a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

24.    Together with the Board of Directors itself, individual defendant members of the Board of Directors are referred to collectively herein as the **"Board Defendants."**

25.    The Board Defendants appointed GreatBanc to be the Trustee of the ESOP in 2015 and appointed the members of the Administration Committee of the ESOP from 2015 to the present. The Board Defendants had an ongoing obligation to monitor GreatBanc and the Administration Committee to ensure they were acting prudently, loyally and in conformance with ERISA's fiduciary requirements and to ensure that the ESOP did not engage in a prohibited transaction when purchasing the Company stock.

26.    Under California Corporations Code § 5210, the activities and affairs of the Company must be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors.

27.    As part of their corporate oversight responsibilities, the Board Defendants were involved in the preparation, review and/or approval of the Company's financial statements and projections.

28.    **Defendant Administration Committee** is a designated Plan Administrator of the ESOP within the meaning of ERISA § 3(16)(A), § 1002(16)(A), and a named fiduciary of the ESOP within the meaning of ERISA § 402, 29 U.S.C. § 1102. The Administration Committee is and was a fiduciary of the ESOP under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of its position as Plan Administrator and because it exercised discretionary authority or discretionary control respecting the management of the ESOP, and/or had discretionary authority or discretionary responsibility in the administration of the ESOP.

29.    Defendants Aubrey Michael, Chad Pinter, and Mark La Bounty have served on the Administration Committee of the ESOP from its inception to the present. The Administration

Committee, along with the defendant individual members of the Committee, are collectively referred to herein as the **"Administrator."**

30.    **Defendant Kruse Investment Company, Inc**., is headquartered in Goshen, California. Defendant Kevin Kruse is or has at some relevant times been the majority shareholder. Kruse Investment Company, Inc. has or at some relevant times had an arrangement with Western Milling whereby Western Milling paid it $67,500 for consulting services, plus 7% of Western Milling's annual net income. Kruse Investment Company, Inc. also provides or at some relevant times provided subordinated sub-debt financing to Western Milling. On November 4, 2015, Kruse Investment Company, Inc. sold 1,582,004 shares of Kruse Western to the ESOP for $193,107,600 and received a warrant to purchase another 806,675 shares. Kruse Investment Company received some or all of its consideration for this sale in the form of subordinated notes. Kruse Investment Company owned more than 50% of the outstanding stock of Kruse Western and was majority owned by a fiduciary of the ESOP, and was thus a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). In addition, it ratified the appointment of GreatBanc as the ESOP Trustee together with the Board Defendants on November 4, 2015.

31.    **Defendant The Tony F. and Mary A. Correia Revocable Family Trust** ("Correia Trust") was created July 19, 2001, and Defendant Tony Correia is or at some relevant times was a trustee. Upon information and belief, Defendant Tony F. Correia is or was a beneficiary of the Correia Trust. On November 4, 2015, the Correia Trust sold 210,251 shares of Kruse Western to the ESOP for $25,664,400 and received a warrant to purchase another 107,608 shares. The Correia Trust received some or all of its consideration for this sale in the form of subordinated notes. As a more than 10% shareholder in Kruse Western, the Correia Trust was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). In addition, it ratified the appointment of GreatBanc as the ESOP Trustee together with the Board Defendants on November 4, 2015.

32.    **Defendant 2007 Knudsen Family Trust** ("Knudsen Trust") was created on August 15, 2007, and Defendant Ejnar Knudsen is or at some relevant times was a trustee. Upon information and belief, Defendant Ejnar Knudsen is or was a beneficiary of the Knudsen Trust. On November 4, 2015, the Knudsen Trust sold 189,902 shares of Kruse Western to the ESOP for

$23,180,400 and received a warrant to purchase another 97,192 shares. The Knudsen Trust received some or all of its consideration for this sale in the form of subordinated notes. Because the Knudsen Trust acts through its trustee, who was a fiduciary of the ESOP, the Knudsen Trust was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). In addition, it ratified the appointment of GreatBanc as the ESOP Trustee together with the Board Defendants on November 4, 2015.

33.    **Defendant The Jeffrey and Karen Fontanella Trust** ("Fontanella Trust") was created on June 28, 20017. Its trustees are or were at some relevant times Jeffrey R. and Karen K. Fontanella. On November 4, 2015, the Fontanella Trust sold 17,843 shares of Kruse Western to the ESOP for $2,178,000 and received a warrant to purchase another 9,132 shares. The Fontanella Trust received some or all of its consideration for this sale in the form of subordinated notes. In addition, it ratified the appointment of GreatBanc as the ESOP Trustee together with the Board Defendants on November 4, 2015.

34.    Defendants Kruse Investment Company, Inc., Correia Trust, Knudsen Trust, and Fontanella Trust are referred to collectively herein as the **"KW Selling Shareholders."**

35.    **Defendant La Bounty Family Trust** ("La Bounty Trust") was created June 2, 2003, and Defendant Mark La Bounty is or at some relevant times was a trustee. Upon information and belief, Defendant Mark La Bounty is or was a beneficiary of the La Bounty Trust. The La Bounty Trust had a 1.819% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $6,548,400 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 27,500 shares of Kruse Western stock, on November 4, 2015. Because the La Bounty Trust acts through its trustee, who is a fiduciary of the ESOP and an employee of the Company and Western Milling, the La Bounty Trust is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, the La Bounty Trust consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

36.   **Defendant Ronald O. Kruse Family Trust** ("R. Kruse Trust") was created on May 31, 1996, and Defendant Ronald O. Kruse is or at some relevant times was a trustee. Upon information and belief, Defendant Ronald O. Kruse is or was a beneficiary of the R. Kruse Trust. The R. Kruse Trust had a 0.216% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $777,600 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 3,300 shares of Kruse Western stock, on November 4, 2015. Because the R. Kruse Trust acts through its trustee, who is a fiduciary of the ESOP, the R. Kruse Trust is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, the R. Kruse Trust consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

37.   **Defendant Jordyn Kruse** had a 0.110% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $396,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 1,700 shares of Kruse Western stock, on November 4, 2015. Jordyn Kruse is Defendant Kevin Kruse's daughter. Thus, she is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, Jordyn Kruse consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

38.   **Defendant Ryan Kruse** had a 0.110% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $396,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 1,700 shares of Kruse Western stock, on November 4, 2015. Upon information and belief, Ryan Kruse is Defendant Kevin Kruse's son. Thus, he is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, Ryan Kruse consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

39.     **Defendant The Douglas T. Kruse Trust** ("D. Kruse Trust) was created October 29, 1996. Its Trustee is or was at some relevant times Douglas T. Kruse. Upon information and belief, Douglas T. Kruse is or was a beneficiary of the D. Kruse Trust. The D. Kruse Trust had a 3.551% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $12,783,600 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 53,600 shares of Kruse Western stock, on November 4, 2015. Upon information and belief, Douglas Kruse is Defendant Kevin Kruse's brother. Because the D. Kruse Trust acts through its trustee, who is a relative of a fiduciary of the ESOP, the D. Kruse Trust is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, the D. Kruse Trust consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

40.     **Defendant The Davis Family Trust** ("Davis Trust") was created in 2014. Its Trustees are or were at some relevant times Robert A. Davis and Lisa A. Davis. Upon information and belief, Robert A. Davis and Lisa A. Davis are or were beneficiaries of the Davis Trust. The Davis Trust had a 2.585% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $9,306,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 39,000 shares of Kruse Western stock, on November 4, 2015. Further, as a member of Western Milling, the Davis Trust consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

41.     **Defendant SECAP** is a California General Partnership which had a 4.653% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $16,750,800 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 70,200 shares of Kruse Western stock, on November 4, 2015. The Managing Partners of SECAP are or were the Seley Family Trust (James C. Seley, Co-Trustee) and the Charlene R. Seley Revocable Trust (Charlene Seley, Trustee). As a member of Western Milling, SECAP consented to Western Milling's initial engagement of GreatBanc as

Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

42.     **Defendant The Kruse Feed and Supply, Inc. Profit Sharing Plan** is or at some relevant times was, on information and belief, a pension plan under ERISA. Richard Henry Kruse is or at some relevant times was the trustee and plan administrator of the plan. The plan had a 3.500% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $12,600,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 52,800 shares of Kruse Western stock, on November 4, 2015. Richard Henry Kruse is Defendant Kevin Kruse's uncle. Because the Kruse Feed and Supply, Inc. Profit Sharing Plan acts through its trustee, who is a relative of a fiduciary of the ESOP, the Plan is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, the Kruse Feed and Supply, Inc. Profit Sharing Plan consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

43.     **Defendant The Lambert Family Revocable Trust** ("Lambert Trust") was created March 15, 2002. Its trustees are or were at some relevant times Mark G. Lambert and Melissa A. Lambert. Upon information and belief, Mark Lambert is or was a beneficiary of the Lambert Trust. The Lambert Trust had a 0.763% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $2,746,800 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 11,500 shares of Kruse Western stock, on November 4, 2015. Upon information and belief, Mark Lambert is or was an employee of Western Milling. Because the Lambert Trust acts through its trustee, who is or was an employee of Western Milling, the Lambert Trust is or was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, the Lambert Trust consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

44.   **Defendants Warren Hutchings and Doreen Hutchings** had a 0.008% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $28,800 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 100 shares of Kruse Western stock, on November 4, 2015. As members of Western Milling, Sydney Earp and Richard Earp consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

45.   **Defendants Sidney Earp and Richard Earp** had a 0.004% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $14,400 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 100 shares of Kruse Western stock, on November 4, 2015. As members of Western Milling, Sydney Earp and Richard Earp consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

46.   **Defendants Mark Krebsbach and Nickie Krebsbach** had a 0.398% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $1,432,800 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 6,000 shares of Kruse Western stock, on November 4, 2015. As members of Western Milling, Mark Kresbach and Nickie Kresbach consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

47.   **Defendant The Joseph M. and Debra L. Guenley Revocable Living Trust** ("Guenley Trust") was created December 14, 2004. Its Trustees are or were at some relevant times Joseph M. and Debra L. Guenley. The Guenley Trust had a 0.041% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $147,600 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 600 shares of Kruse Western stock, on November 4, 2015. As a member of Western Milling, the Guenley Trust consented to Western Milling's initial engagement of

1    GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse

2    Western Board and KW Selling Shareholders.

3        48.    **Defendant The Holdsworth Family Revocable Trust** ("Holdsworth Trust") was

4    created March 11, 2009. Its Trustees are or were at some relevant times Michael G. Holdsworth and

5    Carol D. Holdsworth. The Holdsworth Trust had a 0.041% interest in Western Milling LLC and

6    received a Membership Interest Purchase Agreement Seller Note in the amount of $147,600 on

7    October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to

8    purchase 600 shares of Kruse Western stock, on November 4, 2015. As a member of Western

9    Milling, the Holdsworth Trust consented to Western Milling's initial engagement of GreatBanc as

10    Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western

11    Board and KW Selling Shareholders.

12        49.    **Defendant Daniel J. Martin** had a 0.041% interest in Western Milling LLC and

13    received a Membership Interest Purchase Agreement Seller Note in the amount of $147,600 on

14    October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to

15    purchase 600 shares of Kruse Western stock, on November 4, 2015. As a member of Western

16    Milling, Daniel J. Martin consented to Western Milling's initial engagement of GreatBanc as

17    Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western

18    Board and KW Selling Shareholders.

19        50.    **Defendant The Kruse Family Trust** was created August 20, 1997. Its trustees are

20    or were at some relevant times Defendant Kevin H. Kruse and Bernardina D. Kruse. Upon

21    information and belief, Defendant Kevin Kruse is or was a beneficiary of the Kruse Family Trust.

22    The Kruse Family Trust had a 11.871% interest in Western Milling LLC and received a

23    Membership Interest Purchase Agreement Seller Note in the amount of $42,735,600 on October 31,

24    2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 179,200

25    shares of Kruse Western stock, on November 4, 2015. Because the Kruse Family Trust acts through

26    its trustee, who is an employee of the Company and Western Milling and a fiduciary of the ESOP,

27    the Kruse Family Trust is a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29

28    U.S.C. § 1002(14). Further, as a member of Western Milling, the Kruse Family Trust consented to

Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

51.    **Defendant The Monte and Susan Mello Trust** ("Mello Trust") was created May 22, 2014. Its trustees are or were at some relevant times Monte Mello and Susan Mello. Upon information and belief, Monte Mello is or was a beneficiary of the Mello Trust. The Mello Trust had a 0.090% interest in Western Milling LLC and received a Membership Interest Purchase Agreement Seller Note in the amount of $324,000 on October 31, 2015. This Note was re-issued with more favorable terms, along with a warrant to purchase 1,400 shares of Kruse Western stock, on November 4, 2015. Upon information and belief, Monte Mello is or was an employee of Western Milling. Because the Mello Trust acts through its trustee, who is or was an employee of Western Milling, the Mello Trust is or was a "party in interest" as to the ESOP as defined in ERISA § 3(14), 29 U.S.C. § 1002(14). Further, as a member of Western Milling, the Mello Trust consented to Western Milling's initial engagement of GreatBanc as Trustee on July 6, 2015, prior to ratification of GreatBanc's appointment by the Kruse Western Board and KW Selling Shareholders.

52.    Defendants La Bounty Trust, D. Kruse Trust, Davis Trust, SECAP, the Kruse Feed and Supply, Inc. Profit Sharing Plan, Lambert Trust, Robert Berczynski, Warren Hutchings and Doreen Hutchings, Sidney Earp and Richard Earp, Mark Krebsbach and Nickie Krebsbach, Guenley Trust, Holdsworth Trust, Daniel J. Martin, Kruse Family Trust, Chad Pinter, Jeremy Wilhelm, Mello Trust, Jordyn Kruse, Ryan Kruse, and R. Kruse Trust are referred to collectively herein as the "**WM Member Sellers.**"

### III.  FACTUAL ALLEGATIONS

**Western Milling's History of Monensin Poisoning Issues**

53.    According to Articles of Incorporation obtained from the California Secretary of State, Kruse Western, Inc. ("Kruse Western") was incorporated on September 11, 2015. Kruse Western operates various companies in California, including Western Milling, LLC, OHK Transport LLC, OHK Logistics, LLC, and Winema Elevators, LLC. Prior to January 1, 2016, Kruse Western was a "C corporation." On and after January 1, 2016, the Company converted to a "S corporation."

54.     Western Milling, LLC manufactures a variety of animal feeds.

55.     According to its website, Western Milling aspires "to be the leading and most diverse agriculturally based, nutrient solutions business in the Western United States."

56.     At all relevant times, Western Milling manufactured Western Blend Horse Feed and other animal feeds. Manufacturing animal feed for different species requires a high level of care to avoid cross-contamination. For example, monensin is an ionophore antibiotic that is added to some cattle and poultry feeds. Monensin, however, is highly poisonous to horses.

57.     Between December 2009 and July 2010, the United States Food and Drug Administration found "impermissibly high" samples of monensin in feed samples produced by the Company. Western Milling recalled horse feed in 2011 and turkey feed in 2010 and 2011 due to monensin contamination.On August 5, 2014, approximately 861 cattle at Western Milling's Goshen West Ranch consumed Western Milling feed containing excessively high levels of monensin. As a result, 861 cattle died, and the contaminated feed caused numerous injuries to the reproductive capacities of other cattle.

58.     In November 2014, after Western Milling had already paid more than $2.5 million to owners of cattle that consumed contaminated feed, its insurer issued a reservation of rights. On April 10, 2015, the insurer sued Western Milling in the U.S. District Court for the Eastern District of California, seeking a declaratory judgment that it had no duty to defend or indemnify Western Milling for claims related to the cattle poisoning incident. Litigation was ongoing at the time of the ESOP Transaction.

59.     In September 2015, 21 horses died and 28 other horses were severely sickened at a horse ranch in Clovis, California, due to monensin poisoning caused by Western Blend Horse Feed. Many of the horses suffered a slow and painful death with symptoms including foaming at the mouth, muscle wasting, damage to the heart, colic, sweating, kidney failure, respiratory distress, and the inability to stand. Some of the horses had to be euthanized.

60.     In September 2015, Western Milling issued a recall for Western Blend Horse Feed due to possible monensin contamination.

61.     In 2016, the same facility improperly mixed the same livestock drug into medicated cattle feed, which contributed to the deaths of several dairy calves.

62.     A lawsuit was filed against Western Milling in Fresno Superior Court in February 2016, and Western Milling agreed in 2018 to pay $2.4 million to plaintiffs to settle claims arising from the monensin poisoning caused by its horse feed.

63.     In addition to the lawsuit, the California Department of Food and Agriculture fined Western Milling $726,000 and revoked their commercial feed license "for repeated and multiple violations." Western Milling agreed to stop production of all horse feed at its Goshen, California plant by April 15, 2017.

64.     Western Milling continued to be plagued by monensin contamination problems after the 2015 ESOP Transaction. In September 2016, 87 calves died and 46 other calves were severely sickened after consuming Western Milling-produced feed that contained excessive levels of monensin.

65.     As a result of repeated monensin contamination incidents, Western Milling discontinued the manufacturing of horse and other specialty feeds at its Goshen mill, exited the horse feed business for about a year, and started contracting out the manufacture of horse feed. Western Milling spent approximately $5.5 million to construct a new dedicated horse feed mill separate from its cattle feed mill.

66.     Upon information and belief, the feed mill industry recognized the need for dedicated production lines prior to 2015. Major producers of animal feed had "dedicated lines" in their mills, meaning that only horse feed was produced in that section of the mill, and other areas of the mill were used to produce other products, such as those that include monensin or other ionophores.

67.     In addition, Western Milling and its operating companies also faced significant liability at the time of the 2015 ESOP Transaction due to wage and hour violations at Western Milling's California facilities.

//

//

**The 2015 ESOP Transaction**

68.    Western Milling previously owned 97.5% of Perfection Pet Foods, LLC (PPF). On October 26, 2016, Western Milling entered into a Distribution Agreement, pursuant to which Western Milling distributed its membership interest in PPF to its existing members. To effect this spin-off of PPF, Western Milling distributed its capital accounts balance in the amount of $30 million to the members. Western Milling also made a cash contribution in the amount of $13 million to PPF.

69.    On October 31, 2015, Western Milling reorganized to include Kruse Western as an additional corporate unit holder.

70.    Also on October 31, 2015, Kruse Western, Western Milling, and the WM Member Sellers entered into a Membership Interest Purchase Agreement ("MIPA"), pursuant to which the WM Member Sellers gave up their units in Western Milling in exchange for $115,869,600 payable in promissory notes ("MIPA Seller Notes") bearing interest at a rate of 5% with a 60-year term. The remaining members of Western Milling (the KW Selling Shareholders) exchanged their units for two million shares of stock in Kruse Western in a tax-free exchange.

71.    After this reorganization, which was the first step in the ESOP Transaction, Western Milling was a wholly-owned subsidiary of Kruse Western, and Kruse Western was 100% owned by the KW Selling Shareholders.

72.    Western Milling LLC entered into an Engagement Agreement with GreatBanc on July 6, 2015, with the consent of its members at that time, which called for GreatBanc to evaluate the 2015 ESOP Transaction and determine whether it was in the best interest of the ESOP to go forward. On November 4, 2015, the Board Defendants and KW Selling Shareholders ratified the appointment of GreatBanc as Trustee of the ESOP. This included Defendants Kruse Investment Company, Correia Trust, Knudsen Trust, Fontanella Trust, Kevin Kruse, Robert Berczynski, Chad Pinter, Mark LaBounty, Tony F. Correia, Aubrey Michael, Jeremy Wilhelm, Ejnar Knudsen, and Ronald Kruse.

73.    In the second step of the ESOP Transaction, on November 4, 2015, GreatBanc, acting as Trustee of the ESOP, caused the ESOP to purchase 2 million shares of Kruse Western

stock from the KW Selling Shareholders for $244,130,400. The ESOP's purchase was financed with promissory notes issued by the ESOP in favor of the Selling Shareholders. The ESOP Seller Notes bore interest at 5% per year and had a 60-year term.

74.    Also on November 4, 2015, Kruse Western, Western Milling, and the WM Member Sellers entered into the First Amendment to Membership Purchase Agreement (Amended MIPA). The Amended MIPA provides that the ESOP is a beneficiary of the MIPA.

75.    Also on November 4, 2015, Kruse Western assumed from the ESOP all rights and obligations under the ESOP Seller Notes and executed new notes in favor of the KW Selling Shareholders. These New Seller Notes bore interest at 3% per year and had a 12-year term. Kruse Western also granted the Selling Shareholders 1,023,607 warrants for Kruse Western stock. The ESOP issued a promissory note to Kruse Western in an amount equal to the amount of the ESOP Seller Notes assumed ($244,130,400). The ESOP Loan bore interest at 2.64% per year and had a 60-year term. The ESOP pledged its unallocated shares of stock to Kruse Western as collateral for the Loan.

76.    Pursuant to the original MIPA, Kruse Western was obligated to amend or re-issue the MIPA Seller Notes if the WM Member Sellers' positions as creditors of Kruse Western were diminished or impaired. Because Kruse Western incurred additional debt in the second step of the ESOP Transaction, Kruse Western issued New MIPA Notes in favor of the WM Member Sellers. The New MIPA Notes bore interest at 3% per year and had a 12-year term, and the WM Member Sellers were granted 485,826 warrants for Kruse Western stock.

77.    The Kruse Western Board and shareholder omnibus resolution approving the ESOP Transaction approved the First Amendment to the MIPA and the New MIPA Notes and warrants.

78.    The warrants to the WM Member Sellers and the warrants to the KW Selling Shareholders (collectively, the Warrants) represented approximately 40% of Kruse Western's fully-diluted shares and had a 12-year term with a strike price of $25 per unit.

79.    On information and belief, each of the KW Selling Shareholders continue to hold the New Seller Notes and Warrants received in the ESOP Transaction.

80.     On information and belief, each of the WM Member Sellers continue to hold the New MIPA Notes and Warrants received in the ESOP Transaction.

81.     On information and belief, the balance of each of the personal accounts into which the ESOP Transaction proceeds were deposited have remained above the amount of the total proceeds deposited therein.

82.     The Plan Document contemplates that some or all of the KW Selling Shareholders would invest the proceeds of the ESOP Transaction in "qualified replacement property" pursuant to Section 1042 of the Internal Revenue Code, in order to avoid capital gains tax on the sale of their Kruse Western stock to the ESOP. Under I.R.C. § 1042, the gains on the sale of stock to the ESOP are taxed when the qualified replacement property is sold, and capital gains taxes can be entirely eliminated if the qualified replacement property is held by the KW Selling Shareholders until death. Thus, on information and belief, any KW Selling Shareholders who invested the proceeds in qualified replacement property continue to hold such property to avoid the adverse tax consequences.

83.     Each KW Selling Shareholder who sought deferral of capital gains pursuant to I.R.C. § 1042 was required to complete a signed Statement of Purchase that identified and declared the specific securities that represent the qualified replacement property that was purchased to avoid taxes on the receipt of proceeds from the ESOP Transaction. The Statement of Purchase for each KW Selling Shareholder who elected I.R.C. § 1042 deferral would be filed with his/her tax return.

84.     Less than two months after the ESOP purchased Kruse Western stock, on December 31, 2015, the value of the Company was just $26,600,000.

85.     One year later, the Company had further dropped in value and was worth just $24,800,000.

86.     By December 31, 2017, the Company had not materially regained the value paid by ESOP participants. The value of the Company was just $27,400,000 at the end of 2017.

87.     The ESOP paid more than fair market value in the 2015 ESOP Transaction. The purchase price was based in part on a report dated November 4, 2015 by Stout Risius Ross ("SRR") that was unreliable.

88.    SRR was retained by GreatBanc in its capacity as Trustee of the ESOP to render an opinion on whether the consideration paid by the ESOP was greater than fair market value, whether the terms of the ESOP Seller Loan and ESOP Loan were reasonable, and whether the terms of the Transaction taken as a whole were fair to the ESOP from a financial point of view.

89.    GreatBanc did little or no due diligence of its own, and instead relied almost entirely on SRR's "Analysis of Transaction Fairness" and fairness opinion. GreatBanc attached the latter to the Trustee Certificate approving the transaction. There is no evidence that GreatBanc conducted any critical review or evaluation of the opinions expressed by SRR.

90.    As reported in the ESOP's governmental filings, since the inception of the ESOP in 2015, the valuation of Kruse Western common stock is based on a combination of two primary valuation techniques:

- "Income (Discounted Cash Flows)" which determines the Company's value based on the discounted cash flows generated by the Company in the future using projections of the Company's future EBITDA (earnings before income tax, depreciation and amortization) and Net Income; and

- "Market (Guideline Public Company)" which determines the Company's value based on applying revenue and EBITDA multiples from comparable companies to the Company's projected revenue and EBITDA.

91.    Accordingly, if the financial projections (including EBITDA and Net Income) obtained from the Company's management are inflated, then the value of the Company is inflated.

92.    The SRR report shows that the 2015 ESOP Transaction price was based on unrealistic financial projections that did not reasonably forecast revenue and earnings, particularly given the recurring monensin contamination in Western Milling's animal feed. Thus, GreatBanc's reliance the company's financials and SRR's conclusions drawn therefrom was unjustified.

93.    The SRR report repeats information from Kruse Western's disclosure schedules to the Stock Purchase Agreement that is both incomplete and inaccurate. For example, the SRR report only mentions the 2015 horse poisoning, but Western Milling was also responsible for a major 2014 cattle poisoning, as alleged above. SRR stated that there was expected to be insurance coverage for

claims arising from the horse poisoning, but Western Milling's insurance carrier had already issued reservation of rights letters related to the cattle poisoning and filed a declaratory relief action in April 2015, prior to SRR's report. SRR evidently did no due diligence on the monensin contamination issue other than relying on management disclosures. Thus, GreatBanc failed to adequately consider the business impact and potential legal liability associated with poisoning incidents involving contaminated Western Milling feed.

94.    Moreover, SRR did not analyze whether the ESOP paid the equivalent price for Kruse Western stock as the WM Member Sellers received for their units in Western Milling LLC. Indeed, SRR's analysis says nothing about how the LLC units were valued for the member buyout. SRR and thus GreatBanc failed to adequately consider the first stage of the Transaction in evaluating whether the financial terms of the ESOP stock purchase were fair to the ESOP.

95.    GreatBanc also failed to evaluate how the terms of the 2015 ESOP Transaction compared to the terms proposed by an outside buyer in October 2014. SRR's underlying analysis explicitly did not give any weight to the outside buyer's valuation, and also offered little insight as to why that proposed deal fell through. The SRR analysis simply stated that management decided not to proceed "due to disagreements on a number of key aspects, including overall valuation."

96.    Further, GreatBanc failed to adequately consider the impact of the warrants provided to both sets of Sellers (including the WM Member Sellers), and how they would dilute the value of the shares purchased by the ESOP. SRR's underlying valuation analysis acknowledged that the warrants would dilute the ESOP's equity stake by 40%, but it failed to apply any discount in its valuation analysis to account for this,

97.    On information and belief, because Defendants Kevin Kruse, Tony Correia, Robert Berczynski, Aubrey Michael, Chad Pinter, Jeremy Wilhelm, and Mark La Bounty held management positions at the Company, they knew of the monensin contamination in Western Milling's feed prior to the 2015 ESOP Transaction and related insurance coverage issues, as well as the Company's potential liability for wage and hour violations, and they knew that the financial projections provided to SRR for the ESOP Transaction did not reasonably forecast the Company's future revenues, cash flows and earnings because they did not adequately reflect these problems.

98.     Because California law requires the affairs and activities of the Company to be conducted by or at the direction and supervision of the Board, the other Board Defendants (Ejnar Knudsen and Ronald Kruse) also knew of the Company's problems with monensin contamination and related insurance coverage problems and its potential liability for wage and hour violations prior to the 2015 ESOP Transaction.

99.     Because the Board Defendants were involved in the preparation, review and approval of the Company's financial statements and projections as part of their corporate oversight, they also knew that the financial projections management provided to the valuation firm for the ESOP Transaction did not reasonably forecast the Company's future revenues, cash flows and earnings because they did not adequately reflect the potential liability from monensin contamination and wage and hour violations.

100.    In addition, the Board Defendants selected the management and executives of the Company and were responsible for monitoring, evaluating and deciding their annual compensation and bonuses. As such, the Board Defendants knew that the Company's long-standing and persistent problems with monensin contamination, affecting the Company's future revenues, earnings and cash flow, would impact their compensation decisions for the Company's management and executives.

101.    Thus, the Board Defendants (and the Administrator, which is a subset of the Board Defendants) knew that ESOP overpaid for the Company stock in the ESOP Transaction.

102.    Kruse Western took on excessive debt as part of the 2015 ESOP Transaction which has impaired the value of the ESOP's Company stock.

103.    Because Defendants Kevin Kruse, Tony Correia, Robert Berczynski, Aubrey Michael, Chad Pinter, Jeremy Wilhelm, and Mark La Bounty held management positions at the Company, they knew that that the ESOP Transaction required the Company to take on excessive debt. Because the other Board Defendants' responsibilities include strategic planning and capital management for the Company, they also knew that the ESOP Transaction required the Company to take on excessive debt.

104.    Thus, the Board Defendants (and the Administrator, which is a subset of the Board Defendants) knew that the ESOP Transaction was imprudent in that it required the Company to take on excessive debt, which left the Company over-leveraged and in a precarious financial position.

105.    On information and belief, other WM Member Sellers and KW Selling Shareholders knew about Western Milling's long-standing and persistent problems with monensin contamination and related insurance coverage problems, and that the ESOP Transaction required the Company to take on substantial debt, by virtue of their access to inside financial and business information and their close personal or family relationships with Kevin Kruse and other members of the management team at Western Milling and/or the Company.

106.    Based on their insider knowledge, the WM Member Sellers and KW Selling Shareholders knew that the consideration paid to them in the 2015 ESOP Transaction exceeded fair market value. Likewise, the Board Defendants, Administrator, and management knew that the terms of the 2015 ESOP Transaction exceeded fair market value.

107.    A prudent trustee or other fiduciary who had conducted a prudent investigation also would have concluded that the ESOP was paying more than fair market value for the Kruse Western stock and/or the debt incurred in connection with the Transaction was excessive.

108.    The valuation report and fairness opinion obtained by GreatBanc for the 2015 ESOP Transaction was not provided to Plaintiffs or other the participants of the Western Milling ESOP.

109.    The extreme decline in value of the Company stock owned by the ESOP following the 2015 ESOP Transaction should have caused GreatBanc as well as the Board Defendants and/or the Administrator, at a minimum, to investigate whether the ESOP had paid more than fair market value in the 2015 ESOP Transaction. To the extent that any of the Defendants had conducted such an investigation, that investigation as well as any corrective measures would have been reported in one of the Form 5500s filed with the Department of Labor. As none of the Form 5500s report any such investigation or corrective actions, none of the Defendants investigated whether fiduciary violations had occurred in the 2015 Transaction despite numerous red flags that should have raised concerns.

110.    As a direct and proximate result of the actions of the Defendants related to the 2015 ESOP Transaction, and the excessive consideration paid far beyond fair market value, the ESOP and its participants have suffered at least tens of millions of losses in retirement assets, for which all Defendants are jointly and severally liable.

**The ESOP**

111.    The ESOP covers employees of Western Milling, LLC, OHK Transport LLC, OHK Logistics, LLC, and Winema Elevators, LLC.

112.    As required by 29 U.S.C. § 1102, the ESOP was established and is currently maintained pursuant to a written instrument, entitled the Western Milling Employee Stock Ownership Plan (the "Plan Document").

113.    Section 13(b) of the Plan Document provides that, "Generally, the Trustee will vote shares of the Company Stock at the written direction of the Administrator."

114.    Section 4.3 of the Plan Document provides that "the Trustee shall invest the contributions made for such Accounting Period as directed by the Administrator, in accordance with the provisions of Section 6."

115.    Section 6.1, in turn, provides that the Administrator may direct the Trustee to invest the Employer Contributions in Company Stock.

116.    Section 7.5(b) provides that "Dividends credited to the Participants' ESOP Cash Accounts may, to the extent permitted by law, be applied to the repayment of the Acquisition Loan incurred in connection with the acquisition of such shares, or, as determined in the discretion of the Administrator, be used to purchase shares of Company Stock, or be paid to the Participants as described in Section 7.6(c)."

117.    Under Section 17.2(h), for the Trustee to act without direction from the Administrator, it must be authorized to do so by the Administrator in advance and the Trustee must provide written acceptance of such responsibility.

118.    The terms of the Plan Document establish that the Administrator had and has discretionary authority and control over the management of the ESOP at all times since the ESOP's creation in November of 2015.

## IV.  CLASS ACTION ALLEGATIONS

119.     Plaintiffs bring these claims as a class action pursuant to Fed. R. Civ. P. 23 (a) and (b), on behalf of all participants in the Western Milling ESOP on November 4, 2015 or at any time thereafter who vested under the terms of the Plan and those participants' beneficiaries. Excluded from the Class are Defendants and their immediate family, any fiduciary of the Plan; the officers and directors of Kruse Western (including any of its subsidiaries or affiliates), or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

120.     **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. From inception of the ESOP through 2020, there have been at least 613 total participants, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), in the ESOP.

121.     **Commonality.**  The issues of liability are common to all members of the Class and are capable of common answers, as those issues primarily focus on Defendants' acts (or failure to act). Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

a.     Whether Defendants engaged in a prohibited transaction under ERISA by permitting the ESOP to purchase Kruse Western stock from the Sellers for more than adequate consideration in the 2015 ESOP Transaction;

b.     Whether GreatBanc engaged in a prudent investigation of the 2015 ESOP Transaction;

c.     Whether GreatBanc breached a fiduciary duty to ESOP participants by causing the ESOP to go forward with the 2015 ESOP Transaction for more than fair market value;

d.     Whether the Board Defendants breached their fiduciary duties by failing to adequately monitor GreatBanc and the Administrator;

e.     Whether the WM Member Sellers and Selling Shareholders knowingly participated in prohibited transactions and fiduciary breaches under ERISA;

f.     The amount of losses suffered by the ESOP as a result of Defendants' uinlawful conduct and/or other appropriate remedial and equitable relief.

122.    **Typicality.**  Plaintiffs' claims are typical of those of the Class because their claims arise from the same 2015 ESOP Transaction. Plaintiffs challenge the legality of this plan-wide transaction, whereby stock is allocated to all participants' accounts based on the same valuation of the Company. Like other ESOP participants in the Class, Plaintiffs have received less in their ESOP accounts based on the excessive consideration that was paid to the Sellers, and continue to suffer such losses because Defendants have failed to correct the overpayment by the ESOP, and the ESOP and the Company are burdened with excessive debt.

123.    Because Plaintiffs seek relief on behalf of the Western Milling ESOP pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), their claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class member.

124.    **Adequacy.**  Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class. They understand that this matter cannot be settled without the Court's approval.

125.    Defendants do not have any unique defenses that would interfere with Plaintiffs' representation of the Class.

126.    Plaintiffs have retained counsel competent and experienced in complex class actions, including ERISA and employee benefits litigation, and with particular experience and expertise in ESOP litigation.

127.    **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the ESOP and their participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the ESOP.

128.    **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(B). Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations

to the ESOP, engaged in prohibited transactions with respect to the Plan, or otherwise violated ERISA would, as a practical matter, be dispositive of the interests of the other participants in the ESOP even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

129.    **Rule 23(b)(2).**  Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

130.    **Rule 23(b)(3).** Additionally, and alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. Plaintiffs and all Class members have been harmed by the ESOP paying more than fair market value for Kruse Western stock in the 2015 ESOP Transaction. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

131.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims are brought on behalf of the ESOP, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire ESOP. The losses suffered by individual Class members are small compared to the expense and burden of

individual prosecution of this action. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the ESOP.

132.    The following factors set forth in Rule 23(b)(3) also favor certification of this case as a class action:

a)    The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b)    No other litigation concerning this controversy has been filed by any other members of the Class.

c)    This District is the most desirable location for concentrating the litigation for reasons that include (but are not limited to) the following: (i) the ESOP is administered in part in this District, (ii) certain Defendants can be found in this District, and (iii) certain non-party witnesses are located in this District.

133.    The names and addresses of the Class are available from the ESOP. Notice will be provided to all members of the Class to the extent required by Rule 23.

**COUNT I**

**Prohibited Transaction in Violation of ERISA § 406(a), 29 U.S.C. §§ 1106(a)**

(Against Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Knudsen Trust, Kruse Investment Company, La Bounty Trust, Correia Trust, R. Kruse Trust, Jordyn Kruse, Ryan Kruse, D. Kruse Trust, Kruse Feed & Supply Profit Sharing Plan, Lambert Trust, Kruse Family Trust, Mello Trust, and GreatBanc)

134.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

135.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

136.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include any fiduciary … of such employee benefit plan;" "an employer any of whose employees are covered by such plan;" "a corporation, partnership, or trust or estate of which (or in which) 50 percent or more

of (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate, is owned directly or indirectly" by, *inter alia*, a plan fiduciary; "an employee, officer or director or a 10 percent or more shareholder" of an employer covered by the Plan; and "a relative" of any interested party. 29 U.S.C. § 1002(14)(A), (C), (F), (G), (H). "Relative" means "a spouse, ancestor, lineal descendant, or spouse of a lineal descendant." 29 U.S.C. § 1002(15).

137.     Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Knudsen Trust, Kruse Investment Company, La Bounty Trust, Correia Trust, R. Kruse Trust, Jordyn Kruse, Ryan Kruse, D. Kruse Trust, Kruse Feed & Supply Profit Sharing Plan, Lambert Trust, Kruse Family Trust, and Mello Trust are or were each "parties in interest" within the meaning of ERISA § 3(14) for the reasons described above at paragraphs 14, 17, 19, 20, 30-32, 35-39, 42, 43, 50, and 51.

138.     Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Knudsen Trust, Kruse Investment Company, La Bounty Trust, Correia Trust, R. Kruse Trust, Jordyn Kruse, Ryan Kruse, D. Kruse Trust, Kruse Feed & Supply Profit Sharing Plan, Lambert Trust, Kruse Family Trust, and Mello Trust were parties to the 2015 ESOP Transaction and received millions of dollars in cash, notes, and warrants for the Company stock and Western Milling units they sold. As such, they had actual or constructive knowledge that the 2015 ESOP Transaction constituted a direct or indirect sale of property between the ESOP and themselves as parties in interest. In addition, they had actual or constructive knowledge that the ESOP Loan constituted a use of Plan assets by or for the benefit of themselves as parties in interest. Further, they had actual or constructive knowledge that the 2015 ESOP Transaction was for more than fair market value and not in the best interests of the ESOP. As parties-in-interest, these Defendants are liable for the violations of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D).

139.     ERISA § 408(e), 29 U.S.C. § 1108(e), provides a conditional exemption from the prohibited transaction rules for sale of employer securities to or from a plan if a sale is made for

adequate consideration. The burden is on the fiduciary and the parties-in-interest to demonstrate that conditions for the exemption are met.

140.    ERISA § 3(18)(B) defines adequate consideration as "the fair market of the asset as determined in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18)(B). ERISA § 3(18)(B) requires that the fiduciary or party-in-interest show that the price paid reflected the fair market value of the asset at the time of the transaction, and that the fiduciary conducted a prudent investigation to determine the fair market value of the asset.

141.    As Trustee, GreatBanc caused the Western Milling ESOP to engage in a prohibited transaction in violation of ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D), by approving the Transaction for more than fair market value and for failing to ensure that the ESOP paid no more than fair market value for the the 2015 ESOP Transaction. Specifically, the ESOP paid more than fair market value for shares sold by the KW Selling Shareholders and the WM Member Sellers received more than fair market value for their units as part of the Transaction.

142.    As detailed in the allegations above, the ill-gotten proceeds received from the ESOP Transaction were deposited in the personal accounts of the Selling Shareholders and WM Member Sellers and remain in their possession. Plaintiffs seek appropriate equitable relief from Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Knudsen Trust, Kruse Investment Company, La Bounty Trust, Correia Trust, R. Kruse Trust, Jordyn Kruse, Ryan Kruse, D. Kruse Trust, Kruse Feed & Supply Profit Sharing Plan, Lambert Trust, Kruse Family Trust, and Mello Trust as parties in interest, including the disgorgement of any ill-gotten gains they received in connection with the ESOP Transaction.

## COUNT II

### Prohibited Transaction in Violation of ERISA § 406(b), 29 U.S.C. §§ 1106(b)

(Against Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Ejnar Knudsen, Mark La Bounty, and Ronald Kruse)

143.    Plaintiffs incorporates the preceding paragraphs as though set forth herein.

144.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account[.]" 29 U.S.C. § 1106(b)(1).

145.    ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants[.]" 29 U.S.C. § 1106(b)(2).

146.    ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits a plan fiduciary from "receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

147.    As alleged above, the Plan Document establishes that the Administrator of the ESOP had and has discretionary control over the management of the ESOP at all times since its inception.

148.    As such, the Administration Committee Members were and continue to be fiduciaries of the Western Milling ESOP before and after the 2015 ESOP Transaction.

149.    As alleged above, the Plan Document establishes that the Board of Directors of the Company appoints the Trustee of the ESOP and the Administration Committee of the ESOP, acting for the Company. The Board Defendants are therefore also fiduciaries of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

150.    Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Mark La Bounty, Ejnar Knudsen and Ronald Kruse are members of the Board of Directors and Mssrs. Pinter and La Bounty are members of the Administration Committee, and as such, had fiduciary control over the ESOP. Each of these Defendants (or their family trusts of which they are trustees and beneficiaries) sold shares of Kruse Western stock or units of Western Milling in the 2015 ESOP Transaction, and thus dealt with Plan assets and/or acted as adverse parties to the ESOP in the 2015 ESOP Transaction in violation of ERISA § 406(b), 29 U.S.C. § 1106(b).

151.    Each of these Defendants (or their family trusts of which they are trustees and beneficiaries) also received consideration for their own personal accounts from Western Milling or Kruse Western, parties dealing with the ESOP in connection with the 2015 ESOP Transaction, which involved the assets of the Plan, in violation of ERISA § 406(b), 29 U.S.C. § 1106(b).

152.    Defendants Pinter and La Bounty continue to act in a self-dealing manner and receive consideration for their own personal accounts in violation of § 406(b)(2) and (b)(3) because, on information and belief, they continue to use their discretion as Plan Administrator to determine

what portion of the participants' stock dividends and employer contributions, held in the ESOP, are used to provide accelerated loan payments to themselves given that they are also the note holders on the ESOP's transaction debt.

153.    Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Mark La Bounty, Ejnar Knudsen and Ronald Kruse violated ERISA §§ 406(b)(1)-(3), 29 U.S.C. §§ 1106(b)(1)-(3) for which they are liable as fiduciaries to restore the losses caused by these prohibited transactions, to disgorge profits, and for other appropriate remedial and equitable relief.

## COUNT III
### Breach of Fiduciary Duties Under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)

(Against GreatBanc)

154.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

155.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires that a plan fiduciary act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan."

156.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires that a plan fiduciary act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

157.    In the context of a sale of the sponsoring company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to ensure that the ESOP and its participants pay no more than adequate consideration for the ESOP's assets and the participants' account in the ESOP.

158.    Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

159.    GreatBanc was required to undertake an appropriate and independent investigation of the fair market value of the Kruse Western stock before approving the 2015 ESOP Transaction in

order to fulfill its fiduciary duties. Among other things, GreatBanc was required to conduct a thorough and independent review of any "independent appraisal," to make certain that reliance on any and all valuation experts' advice was reasonably justified under the circumstances of the 2015 ESOP Transaction; to investigate the credibility of the management assumptions and earnings projections underlying the valuation, and to make an honest, objective effort to read and understand the valuation reports and opinions and question the methods and assumptions that did not make sense.

160. An appropriate investigation would have revealed that the valuation used for the 2015 ESOP Transaction and the price ultimately paid by the ESOP did not reflect the fair market value of the stock purchased by the ESOP.

161. An appropriate investigation would have revealed that it was imprudent for the ESOP to take on excessive debt.

162. An appropriate investigation would have revealed that purchasing the Company was not in the best interest of the ESOP participants.

163. After the 2015 ESOP Transaction, GreatBanc was obligated to remedy the ESOP's overpayment, including as necessary correcting the prohibited transaction by attempting to restore the amount overpaid by the ESOP back to the ESOP, and also including, if necessary, by filing a lawsuit on behalf of the ESOP.

164. By causing the ESOP to engage in the 2015 ESOP Transaction, and failing to restore the losses caused thereby, GreatBanc breached its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B) and caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

## COUNT IV
### Failure to Monitor in Violation of ERISA §§ 404(a)(1)(A) and (B)
### 29 U.S.C. §§ 1104(a)(1)(A) and (B)

(Against the Board Defendants and the Administrator)

165. Plaintiffs incorporate the preceding paragraphs as though set forth herein.

166. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires that a plan fiduciary act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan."

167.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B) requires that a plan fiduciary act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

168.    ERISA § 404(a)(1)(A) and (B) provide that any fiduciary with the power to appoint and/or remove other fiduciaries has an obligation to undertake an appropriate investigation to make certain that the appointed fiduciary is qualified to serve in the position as fiduciary, and to monitor the appointed fiduciary to ensure that he/she remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA. If the appointed fiduciary has violated or continues to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and attempt to restore any losses to the plan caused by the ERISA violations.

169.    GreatBanc was appointed by the Board Defendants. Thus, the Board Defendants had a duty to monitor GreatBanc.

170.    The ESOP Plan Document provides that the Administrator is appointed by the Board of Directors. Thus, the Board Defendants also had a duty to monitor the Administrator.

171.    The Plan Document further confers power over the Trustee on the Administrator: for example, the Trustee votes shares of Company stock at the written direction of the Administrator, and the Administrator directs the Trustee to invest employer contributions in Company stock. Thus, the Administrator had a duty to monitor GreatBanc.

172.    The Board Defendants breached their duties under ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B) because they failed to monitor GreatBanc and the Administrator to ensure that the ESOP did not engage in the 2015 ESOP Transaction given the inflated stock price, and/or that the ESOP paid no more than fair market value for Company stock in the Transaction, and/or that GreatBanc took remedial action after the 2015 ESOP Transaction.

173.    The Administrator also breached duties under ERISA § 404(a)(1)(A) & (B), 29 U.S.C. § 1104(a)(1)(A) & (B) because the Administrator failed to monitor GreatBanc and ensure GreatBanc took remedial action after the 2015 ESOP Transaction.

**COUNT V**
**Co-Fiduciary Liability Under ERISA §§ 405(a)(1) and (a)(3),**
**29 U.S.C. §§ 1105(a)(1) and (a)(3)**

(Against the Administrator and the Board Defendants)

174.     Plaintiffs incorporate the preceding paragraphs as if set forth herein.

175.     ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" [] "if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary[.]"

176.     Because the Administrator held management and leadership positions within the Company, (i) they were involved in preparing the revenue, earnings and cash flow projections underlying the valuation relied upon by GreatBanc that resulted in the ESOP overpaying for the stock it purchased; (ii) they knew about the long-standing and persistent problems related to monensin contamination in Western Milling animal feed and the failure of the financial projections to adequately reflect these problems; and (iii) they knew that the inflated financial projections they prepared would be used to determine the value the ESOP would pay for the stock that was purchased and thus cause the ESOP to overpay.

177.     Thus, the Administrator knowingly participated in the fiduciary violations of GreatBanc alleged above, and knew that GreatBanc's actions violated ERISA. As such, under ERISA § 405(a)(1)), 29 U.S.C. § 1105(a)(1), the Administrator is liable as co-fiduciary for the ESOPs losses as a result of GreatBanc's fiduciary violations.

178.     As alleged above, the Board Defendants were involved in and/or directed the preparation of the financial projections underlying the valuation relied upon by GreatBanc in determining the purchase price the ESOP paid for the stock that it purchased. The Board Defendants also knew about the long-standing and persistent problems related to monensin contamination in Western Milling animal feed and the failure of the financial projections to adequately reflect these problems.

179.     Thus, the Board Defendants knowingly participated in the fiduciary violations by GreatBanc, which relied on those financial statements and projections in agreeing to the price the

ESOP paid for Kruse Western stock, and they knew GreatBanc's actions violated ERISA. As such, under ERISA § 405(a)(1)), 29 U.S.C. § 1105(a)(1), the Board Defendants are liable as co-fiduciaries for the ESOPs losses as a result of GreatBanc's fiduciary violations.

180.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" [] "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

181.    Because the persons who served on the Administration Committee held management positions at the Company, they knew of the problems with monensin contamination of Western Milling's feed prior to the 2015 ESOP Transaction as well as the Company's potential liability for wage and hour violations. Given their role in the preparation of financial statements and projections, they also knew that the financial projections underlying the ESOP's purchase price did not adequately reflect the Company's future revenues, cash flows and earnings. Thus, the Administrator knew that the ESOP overpaid for the Company stock.

182.    As such, the Administrator knew that GreatBanc committed fiduciary violations in approving the ESOP Transaction.

183.    The Administrator failed to make reasonable efforts to remedy fiduciary violations associated with the ESOP's overpayment.

184.    For example, the Administrator could have asked GreatBanc, the Sellers, or insurers to restore the amount of the overpayment to ESOP participants.

185.    At a bare minimum, the Administrator could have brought the matter to the attention of the Secretary of Labor.

186.    Yet the Administrator took no actions and made no efforts to remedy GreatBanc's fiduciary violations and thus is liable as a co-fiduciary for the losses caused to the ESOP by GreatBanc's fiduciary violations pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3).

187.    As alleged above, the Board Defendants knew of the Company's problems with monensin contamination and its potential liability for wage and hour violations prior to the 2015 ESOP Transaction.

188.    Because the Board Defendants were involved in the preparation, review and approval of the Company's financial statements and projections as part of their corporate oversight, they also knew that the financial projections management provided to the valuation firm for the ESOP Transaction did not adequately reflect the Company's future revenues, cash flows and earnings because they did not adequately reflect the potential liability from the monensin contamination and the wage and hour violations.

189.    As such, the Board Defendants knew of GreatBanc's fiduciary violations.

190.    Despite this knowledge, the Board Defendants failed to take reasonable steps to remedy GreatBanc's fiduciary violations of ERISA, including using their power to remove GreatBanc as Trustee; using their power over the Company's management and executives to correct the unreasonable financial projections; and using their power over GreatBanc and other Defendants to restore to the ESOP the value of its overpayment for Kruse Western stock. And because some of the Board Defendants themselves sold Company stock to the ESOP, they could have simply returned the overpayment they received.

191.    At a bare minimum, the Board Defendants could have brought the matter to the attention of the Secretary of Labor.

192.    Yet the Board Defendants took no actions and made no efforts to remedy GreatBanc's fiduciary violations. Accordingly, each Board Defendant is liable as a co-fiduciary for the losses caused to the ESOP by GreatBanc's fiduciary violations. ERISA §§ 405(a)(3), 29 U.S.C. §§ 1105(a)(3).

## COUNT VI
### Equitable Relief Under ERISA § 502(a)(3), 29 U.S.C § 1132(a)(3)
(Against the WM Member Sellers and KW Selling Shareholders)

193.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

194.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be held liable under this section regardless of whether it is a fiduciary. A non-fiduciary transferee of ill-gotten assets of

the Plan is subject to equitable disgorgement of those assets if the non-fiduciary had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

195.    The Sellers knowingly participated in and profited from the fiduciary breaches and prohibited transactions alleged herein with full knowledge that their ownership interests were being unlawfully acquired for greater than fair market value.

196.    Pursuant to 29 U.S.C. § 1132(a)(3), the Sellers should be required to disgorge the consideration they have received as a result of the 2015 ESOP Transaction. As discussed above, the consideration that the Sellers received impermissibly exceeded the fair market value of their ownership interests. Moreover, the Sellers had actual or constructive knowledge that they were receiving greater than fair market consideration based on, *inter alia*, (i) their personal familiarity with the value of their own equity interests; (ii) their access to the books and records of Western Milling and/or Kruse Western; (iii) their inside knowledge of confidential financial and business information pertaining to the same; (iv) their awareness of the feed contamination issues referenced above and related legal and reputational liabilities; (v) their inability to sell their ownership interests to an outside buyer who had expressed an interest in acquiring Western Milling and Perfection Pet Foods in October 2014; (vi) the failure to secure any other outside buyer; (vii) their status as officers, directors, or members of the Kruse family to the extent they acted in such capacities; and (viii) their close personal and/or family relationships to other company insiders.

197.    All consideration to the Sellers in connection with the 2015 ESOP Transaction, including the Warrants and notes they received, is in the current possession of the Sellers and/or traceable.

198.    The Sellers cannot retain this consideration, which rightfully belongs to the ESOP, to the extent it exceeded the fair market value or their shares or membership interests.

## COUNT VII
### Violation of ERISA § 410 & Breach of Fiduciary Under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. § 1110 & §§ 1104(a)(1)(A) and (B)

(Against GreatBanc, the Board Defendants and the Administrator)

199.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

200.    ERISA § 410(a), 29 U.S.C. § 1110(a), provides in relevant part (with exceptions not applicable here) that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [ERISA Part IV] shall be void as against public policy." As Part IV of ERISA includes ERISA §§ 404, 405, and 406, 29 U.S.C. §§ 1104, 1105 and 1106, any provision that attempts to relieve a fiduciary of liability is void pursuant to ERISA § 410(a), unless there is an exception or exemption. No such exception or exemption is applicable here.

201.    The DOL Regulations promulgated under ERISA § 410, 29 C.F.R. § 2509.75-4, renders "void any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan" because it would have "the same result as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations."

202.    For a 100% ESOP-owned company, a provision requiring indemnity by the ESOP-owned company is treated as an indemnity provision by the Plan because it effectively requires ESOP participants to pay for the costs of the breaching fiduciaries' liability.

203.    Section 15 of the Engagement Agreement between GreatBanc and Western Milling provides that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

204.    As this instrument attempts to relieve GreatBanc of its responsibility or liability for certain ERISA violations or to have the Company and thereby the ESOP be responsible for such liability, it is void as against public policy.

205.    By agreeing to such a provision that is void against public policy under ERISA § 410, the Board Defendants breached their fiduciary duties under ERISA by failing to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries (A) for the exclusive purpose of providing benefits to participants and beneficiaries and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and aims, in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

206.    As such, the indemnification provisions in the Engagement Agreement (or any similar agreements governing the relationship between GreatBanc and Western Milling and/or Kruse Western) should be declared void ab initio and should be stricken or modified accordingly.

207.    Further, GreatBanc should be ordered to disgorge any indemnification payments made by Western Milling, Kruse Western, and/or the ESOP, plus interest.

208.    The ESOP Plan Document provides that the Company shall indemnify the Administrator, officers and directors of the Company and, *inter alia*, Western Milling "from and against any and all liability to which the Administrator and such other persons may be subject under any applicable federal or state law or otherwise relating to the administration of the Plan and the Trust." It goes on to state that "any such indemnification or agreement to hold any such person harmless shall not apply to any claim, damage, expense, liability or loss that is attributable to its or their bad faith, breach of fiduciary duty under ERISA, negligence, willful misconduct, or a material breach of the terms of the Plan," but it does not contain a carve-out for prohibited transaction claims, thus permitting the Board Defendants to seek indemnification if they are held

liable for causing the ESOP to engage in a prohibited transaction. The indemnification provision in the Plan should be declared void ab initio and should be reformed to strike or modified accordingly.

209.     The Company's bylaws give the Company the power to indemnify any officer, director, employee or other agent of the corporation "to the maximum extent permitted by the California General Corporation law." To the extent the California General Corporation law would permit indemnification of the Board Defendants, Administrator, or GreatBanc for ERISA violations, this provision of the bylaws should be declared void ab initio and should be stricken or modified accordingly.

210.     As a result, the Board Defendants and the Administrator, and any other employees of Western Milling or the Company, also should be ordered to disgorge any indemnification payments made by Western Milling, Kruse Western, and/or the ESOP, plus interest.

## VIII.  PRAYER FOR RELIEF

Plaintiffs on behalf of themselves and the Class, pray that judgment be entered against Defendants on each Count and that the Class be awarded the following relief:

A.     Declare that GreatBanc, the Board Defendants, and the Administrator have each breached their fiduciary duties under ERISA;

B.     Declare that Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Knudsen Trust, Kruse Investment Company, La Bounty Trust, Correia Trust, R. Kruse Trust, Jordyn Kruse, Ryan Kruse, D. Kruse Trust, Kruse Feed & Supply Profit Sharing Plan, Lambert Trust, Kruse Family Trust, and Mello Trust have each engaged in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a) through the 2015 ESOP Transaction;

C.     Declare that Defendants Kevin Kruse, Robert Berczynski, Chad Pinter, Jeremy Wilhelm, Mark La Bounty, Ejnar Knudsen, and Ronald Kruse have each engaged in prohibited transactions in violation of ERISA § 406(b), 29 U.S.C. § 1106(b) through the 2015 ESOP Transaction;

D.    Declare that the Sellers knowingly participated in and profited from the fiduciary breaches and prohibited transactions alleged herein with full knowledge that their ownership interests were being unlawfully acquired for greater than fair market value;

E.    Enjoin GreatBanc, the Administrator and the Board Defendants from further violations of their fiduciary responsibilities, obligations and duties;

F.    Remove GreatBanc as the Trustee of the Western Milling ESOP and/or bar it from serving as a fiduciary of the ESOP in the future;

G.    Appoint a new independent fiduciary to manage the Western Milling ESOP and order the costs of such independent fiduciary be paid for by Defendants;

H.    Order each fiduciary found to have violated ERISA, including breaching his/her/its fiduciary duties to the ESOP, to jointly and severally pay such amount to restore all losses resulting from their breaches and to disgorge all profits made through use of assets of the ESOP;

I.    Order that Defendants provide other appropriate equitable relief to the ESOP, including but not limited to reforming or rescinding the Transaction, forfeiting their ESOP accounts, providing an accounting for profits, surcharge, and/or imposing a constructive trust or equitable lien on any funds wrongfully held by any of the Defendants;

J.    Order Defendants to provide all accountings necessary to determine the amounts Defendants must remit to the ESOP to restore losses and to disgorge any profits fiduciaries obtained from the use of ESOP assets or other violations of ERISA § 404 and 406, 29 U.S.C. § 1104 and 1106;

K.    To the extent necessary, issue an injunction or order creating a constructive trust into which all ill-gotten gains, fees and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the ESOP's participants and beneficiaries.  This includes, but is not limited to, the ill-gotten gains, fees and/or profits paid to any of the Defendants that have been wrongly obtained as a result of breaches of fiduciary duty or prohibited transactions or other violations of ERISA;

L.      Order pursuant to ERISA § 206(d)(4) that any amount to be paid to the ESOP accounts of the Class can be satisfied by using or transferring any breaching fiduciary's ESOP account in the Plan (or the proceeds of that account) to the extent of that fiduciary's liability.

M.      Require Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or order payment of fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the Class;

N.      Issue a preliminary and permanent injunction barring Defendants and each of them from seeking to enforce Section 15 of the Engagement Agreement between GreatBanc and Western Milling, or any other indemnification agreement between Defendants and the ESOP or Kruse Western or Western Milling; and declare that any such indemnification agreement violates ERISA § 410, 29 U.S.C. § 1110, and is therefore null and void;

O.      Order Defendants and each of them to reimburse the ESOP or Kruse Western or Western Milling for any money advanced by the ESOP or Kruse Western or Western Milling, respectively, under any indemnification agreement or other instrument between Defendants and the ESOP or Kruse Western or Western Milling;

P.      Award pre-judgment interest and post-judgment interest; and

Q.      Award such other and further relief that the Court determines that Plaintiffs and the Class are entitled to pursuant to ERISA § 502(a)(2) and/or § 502(a)(3), 29 U.S.C. § 1132(a)(2) and/or 1132(a)(3) or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure or that is equitable and just.

DATED: June 29, 2022                    Respectfully Submitted,


                                        By: ___/s/ Nina Wasow_____
                                            Daniel Feinberg (SBN No. 135983)
                                            Nina Wasow (SBN No. 242047)
                                            Andrea Obando (SBN No. 312640)
                                            FEINBERG, JACKSON, WORTHMAN
                                            & WASOW, LLP
                                            2030 Addison Street, Suite 500
                                            Berkeley, CA 94704
                                            Tel. (510) 269-7998
                                            Fax (510) 269-7994

dan@feinbergjackson.com
nina@feinbergjackson.com
andrea@feinbergjackson.com

Michelle C. Yau (admitted *pro hac vice*)
Mary J. Bortscheller (admitted *pro hac vice*)
Kai Richter (admitted *pro hac vice*)
Laura E. Older (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel. (202) 408-4600
Fax (202) 408-4699
myau@cohenmilstein.com
mbortscheller@cohenmilstein.com
krichter@cohenmilstein.com
lolder@cohenmilstein.com

*Counsel for Plaintiffs and the Proposed Class*